**ANACONDA BUILDING MATERIALS CO. et al., Appellants,**

v.

**John N. NEWLAND, Trustee of the Estate of Hughes Homes, Inc., a corporation, et al., debtors, Appellees.**

No. 19027.

United States Court of Appeals
Ninth Circuit.

Sept. 21, 1964.

R. Lewis Brown, Jr., Butte, Mont., for appellants.

Philip A. Loomis, Jr., General Counsel, David Ferber, Associate Gen. Counsel, Robert W. Cox, Securities and Exchange Comm., Washington, D. C., and C. J. Odenweller, Jr., Securities and Exchange Comm., San Francisco, Cal., for appellee Securities and Exchange Comm.

Joseph J. McCaffery, Jr., Butte, Mont., Henry E. Savage, Colfax, Wash., Arnold T. Beebe, Blackfoot, Idaho, H. William Furchner, Blackfoot, Idaho, for appellees. Debenture Holders.

Before MADDEN, Judge of the Court. of Claims, and HAMLEY and DUNIWAY, Circuit Judges.

HAMLEY, Circuit Judge:

This appeal arises in consolidated proceedings under Chapter X of the National Bankruptcy Act (Act), Act of June 22, 1938, 52 Stat. 883, as amended 11 U.S.C. § 501 et seq. (1958). The proceedings involve the proposed reorganization of Hughes Homes, Inc., an insolvent Montana corporation, and four insolvent subsidiary corporations.

Certain major trade creditors of the parent corporation indicated to the debtors' trustee that they intended to assert claims against the assets of the subsidiaries, claiming the right to share pro rata in those assets with the creditors of the subsidiaries. The trustee thereupon applied to the district court for instructions as to the relative rights. of the creditors of the parent corporation and the creditors of the subsidiary corporations in the assets of the latter.

The debenture holders of each of the four subsidiaries filed objections, taking the position that the subsidiaries should be treated as separate entities and that their respective net assets should be distributed solely on that basis. The United States Securities and Exchange Commission intervened pursuant to section 208 of the Act, 11 U.S.C. § 608 (1958). The Commission filed a statement to the effect that it did not know of any legal or equitable basis for permitting creditors of the parent corporation to be accorded parity of treatment with the creditors of the subsidiaries in respect to subsidiary assets.

Anaconda Building Materials Co., and M. & L. Supply Co., creditors of the parent corporation, filed an answer to the trustee's application, asking that they be permitted to share in the assets of the subsidiaries to the same extent as they would be entitled to share in the assets of the parent corporation. At the time of the hearing before the district court a third creditor of Hughes Homes, Inc., Billings Sash and Door Co., desiring to assert the same position as the other two creditors, was permitted to appear and participate in the proceedings.

After the hearing and following the entry of findings of fact and conclusions of law, the district court entered an order disposing of the trustee's application. The court determined that the assets of the subsidiaries may not be used to satisfy the claims of the creditors of the parent corporation. The three objecting creditors appeal. The debenture holders and the Securities and Exchange Commission, as appellees, defend the district court order. The trustee has made no appearance in this court.

The relevant facts, set out below, are based on the findings of the district court. In 1956 or 1957, Ed C. Hughes, Jr. and Ed C. Hughes, Sr., doing business as a partnership, commenced the business of constructing prefabricated homes at Butte, Montana. On September 5, 1958, the business was incorporated as Hughes Homes, Inc., under the laws of that state. Ed C. Hughes, Jr. was the principal stockholder and a member of the board of directors. During the period from 1956 to September 8, 1961, the objecting creditors furnished materials to the partnership and the corporation which succeeded it, extending credit in varying amounts.

Hughes Homes, Inc., later found itself unable to dispose of mortgages on the prefabricated homes. In order to obtain an available source of cash it arranged for the formation of four subsidiary corporations, each named Hughes Homes Acceptance Corporation, one each incorporated in Idaho, Montana, Washington and Wyoming. The first of these subsidiaries was organized on April 30, 1959, and the last on February 19, 1960. Hughes Homes, Inc. subscribed for all of the stock of each subsidiary. Except for organizational expenses and capital contributions, the parent corporation assumed no obligation for the indebtedness of any of the Acceptance Corporations and paid none of their creditors.

Following the formation of the Acceptance Corporations, each of them issued debenture bonds which were sold only to the residents of the state in which the respective subsidiaries were incorporated. These debentures were sold upon the representation that the proceeds from the sale of the debentures would be invested in and secured by home mortgage loans on real properties within their respective states. The licensing authority of each state required that the Acceptance Corporation formed therein would maintain cash or securities equal to one hundred per cent of the debentures sold.[1]

Apart from the ordinary expenses of doing business, all monies of the Acceptance Corporations derived in the manner stated were used for the purchase of mortgages of the parent corporation at

1. The sale of debentures ended when the Securities and Exchange Commission obtained an injunction against Hughes Homes, Inc., the Montana Acceptance Corporation, and Ed C. Hughes, Jr., from offering and selling securities of that Acceptance Corporation by means of untrue statements of material facts or by

a discount. The parent corporation, in turn, used these monies to carry on its business of manufacturing and selling prefabricated homes, including payments to the objecting creditors.

Ed Hughes, Jr. was the executive and administrative officer of each of the corporations. Each Acceptance Corporation, however, also had its own executive officer in the person of an executive vice president with authority to implement board decisions, and conduct all operations. The executive vice-presidents acted independently in the acceptance and approval of mortgage securities, and the issuance of debentures, and acted upon the advice of independent legal counsel in matters of corporate action. Each of the subsidiaries maintained its own offices, separate books, bank accounts, and personnel.

The parent corporation, in the main, benefited from the operation of the subsidiaries, and not vice versa. Such benefits received by the parent corporation were sometimes the result of improper action on behalf of the parent corporation. For example, Hughes Homes, Inc. received substantial sums of money from the subsidiaries in exchange for securities of a value which had been misrepresented. Likewise, Hughes Homes, Inc., in certain instances, drew upon funds of the Acceptance Corporations for advances which were thereafter credited by compensating book entries without payment of interest. There were also instances in which fictitious securities were issued to the subsidiaries by the parent corporation in exchange for money payments.

Despite the use of some common directors and officers it was not established that the parent corporation and its sub-sidiaries were operated, in effect, as a single entity. There was no showing that the Acceptance Corporations were incorporated or operated as a subterfuge or to perpetrate a fraud. On the contrary, the evidence established that the parent occasionally had the uncompensated use of money of the Acceptance Corporations for the benefit of the creditors of the parent.

The parent corporation was underfinanced and its continued existence was made possible only by the financial support furnished by the subsidiaries. The adjusted balances between the parent and its subsidiaries demonstrated an overall indebtedness of the parent to the Acceptance Corporations.

In extending credit to Hughes Homes, Inc., the objecting creditors relied solely upon the representations of Ed Hughes, Jr. as to the number of shell homes sold and to be produced and the profit to be derived therefrom. They accepted the sole credit of the parent corporation and none of them requested the additional security of a promise to pay by any of the Acceptance Corporations.[2] It was not shown that any of the latter corporations by corporate action assumed the payment of any of the obligations of Hughes Homes, Inc. There were isolated ultra-vires acts of the common executive and administrative officer of all the corporations, namely Ed C. Hughes, Jr., indulged in without corporate or other authority.

Based upon these facts the district court concluded that each Acceptance Corporation existed as a separate corporate entity and that the objecting creditors were not prejudiced by the corporate relationship existing between the parent corporation and its subsidiaries.

omissions to state material facts, in violation of section 17(a) of the Securities Act of 1933, 48 Stat. 84, as amended, 68 Stat. 686, 15 U.S.C. § 77q(a), (1958). As a part of the consent decree in that action a receiver for Hughes Homes, Inc., and each of its subsidiaries was appointed. Thereafter, each of the corporations filed a petition for reorganization under Chapter X of the Act.

2. One of the objecting creditors, Billings Sash and Door Co., by contractual agreement with Hughes Homes, Inc., in furtherance of a proposed shell home construction plan, agreed to extend additional credit to the parent corporation and accepted as collateral, hypothecated by the parent, the entire issue of common stock of the Montana Acceptance Corporation.

The court also concluded that the debenture holders had not been unjustly enriched at the expense of the objecting creditors. The court further determined that the ultra vires acts of Ed C. Hughes, Jr. were not binding upon or chargeable as a legal act of any of the Acceptance Corporations. A piercing of the corporate veil of any of the subsidiary corporations, the court held, was not necessary to do equity but would, in fact, be inequitable *per se*.

Based on these conclusions of law the court entered the order, now under review, withholding the assets of the Acceptance Corporations from the reach of the objecting creditors of Hughes Homes, Inc.[3]

Appellants challenge many of the findings of fact, quoting substantial parts of such findings in the specifications of error. The specifications of error, however, contain no indication of the particular respects in which the quoted findings are erroneous.[4] Nor, with one exception,[5] is this information expressly stated elsewhere in appellants' brief. There is a considerable discussion of the evidence in that brief, but none of it, with the one exception mentioned above, is referenced to any particular finding of fact or specification of error.

Notwithstanding the resulting difficulty in ascertaining the specific asserted defects in the findings, and in relating appellants' argument thereto, we have made every effort to evaluate, on the merits, appellants' attack upon the findings of fact. The evidence to which appellants call attention provides some support for the view that the subsidiary corporations commenced business with minimal capitalization, although the trial court found to the contrary. Such evidence also shows that the control exercised by Ed C. Hughes, Jr. over the subsidiary corporations was more extensive than indicated in the findings. In addition, appellants bring to light isolated instances, not adverted to in the findings, in which the Acceptance Corporations were the beneficiaries of improper action by the parent corporation.

■ On the whole, however, we do not believe such evidence substantially undermines the general findings of fact that the subsidiaries were operated as separate entities, that on balance the parent corporation was the beneficiary of the corporate inter-relationship, that the objecting creditors did not rely upon the credit of the subsidiaries and were benefited rather than prejudiced by the way in which the subsidiaries were operated, that there was no fraud or overreaching attributable to the Acceptance Corporations or debenture holders detrimental to the objecting creditors, and that there was no unjust enrichment of debenture holders. We therefore hold that in all respects essential to the result reached, the findings of fact are not clearly erroneous.

3. With regard to one creditor, Billings Sash and Door Co., this determination was also based upon this additional conclusion of law applicable only to that creditor:

"XIII

"That the creditor, Billings Sash and Door Company, by its own act in accepting security and extending credit committed in the future for shell home construction by the Parent Corporation must look to its security for the satisfaction of its debt and equitably is estopped from asserting a position as a general creditor or attempting to reach the assets of any of the Acceptance Corporations by a voluntary act of its own in surrendering its securities in order to be classified as a general creditor of the Parent Corporation."

4. Rule 18(2) (d) of the rules of this court, provides, in part:
"In all cases, when findings are specified as error, the specification shall state as particularly as may be wherein the findings of fact and conclusions of law are alleged to be erroneous."

5. Discussing a part of finding of fact No. XV to the effect that counsel for the creditors had admitted that no fraud was perpetrated upon the creditors by the Acceptance Corporations, challenged in specification No. 8, appellants point out in their brief that the admission was as to the lack of fraud by the debenture holders, not the Acceptance Corporations.

To the extent that appellants' argument on the law is premised upon alleged fraud attributable to the Acceptance Corporations which prejudiced the creditors of Hughes Homes, Inc., and benefited the Acceptance Corporations, it must be rejected since we have sustained the contrary findings as to fraud.

But much of appellants' legal argument is that, even in the absence of a showing of fraud, where there are inequitable practices which make it unjust to do otherwise, the corporate entity may be disregarded. Statements to this effect, contained in the decisions rendered in Hudson v. Wylie, 9 Cir., 242 F.2d 435, 442; and Fitzgerald v. Central Bank & Trust Co., 10 Cir., 257 F.2d 118, 120, are called to our attention. Appellants believe that the facts of the Fitzgerald case, and of Selected Investments Co. v. Duncan, 10 Cir., 260 F.2d 918, closely approach those of the case before us and provide authority which we should follow.

Accepting the principle that circumstances short of actual fraud may warrant disregard of a corporate entity, we do not believe that the Selected Investments and Fitzgerald cases provide precedent for applying that principle here.

The Selected Investments case did not involve any question with regard to the respective rights of creditors of parent and subsidiary. The only rights considered were those of certificate holders in a trust fund which had been managed by a corporation through which the controlling individual siphoned funds to satellite corporations.[6]

In Fitzgerald the bankrupt corporation and a sales corporation were operated by a Mr. Berger. The sales company overdrew on its account with the bank, creditor, to the extent of $67,000 to $70,000 by check kiting schemes. The bankrupt, in turn, misappropriated through check kiting from the account of the sales company in the bank to the extent of over $70,000. In order to secure a loan from the bank to be applied against the overdrawn account of the sales company, the bankrupt corporation executed to the bank a note, mortgage and assignment. Thus the bank became a creditor of the bankrupt corporation through whose veil the bank was permitted to pierce.

The findings of fact which we have upheld foreclose any argument based upon asserted inequitable conduct to the prejudice of the creditors and the benefit of the debenture holders, just as surely as they foreclose any argument based upon alleged fraud.

The only factual foundation in the findings which remains for a holding favorable to the creditors is that there were common officers and directors for the five corporations. In addition the creditors find factual support in the record, but not in the findings, for the contention that the Acceptance Corporations commenced business with minimal capitalization,[7] and that Ed C. Hughes, Jr., the president of each corporation, dominating all of them mismanaged the entire enterprise and obtained credit for Hughes Homes, Inc. on the basis of fraudulent representations which, however, were not attributable, or of benefit to the Acceptance Corporations.

Circumstances of this kind, considered separately or together, are insufficient to warrant dilution of the assets of an insolvent subsidiary corporation for the benefit of the creditors of the parent corporation and to the detriment of the blameless creditors of the subsidiary.[8]

Affirmed.

6. The Hudson case, referred to above, is equally distinguishable. In that case a bankrupt individual had utilized a corporation, which he had caused to be incorporated while he was insolvent and which was owned by his wife, his son and his lawyer, to receive payment for work that he, as an individual, performed. It was held that the corporation " * * * was organized solely for the purpose of defrauding the creditors of the bankrupt, * * * " 242 F.2d at 441.

7. The trial court entered a contrary finding as to this, although the same is denominated a conclusion of law.

8. See Commerce Trust Co. v. Woodbury, 8 Cir., 77 F.2d 478, 491; Kingston Dry Dock Co. v. Lake Champlain Transportation Co., 2 Cir., 31 F.2d 265, 267.