310 F.Supp. 110 (1969)
In the Matter of SECURITY PRODUCTS COMPANY, Bankrupt.
No. 65 B 1597(3).
United States District Court E. D. Missouri, E. D.
October 1, 1969.
*111 C. Perry Bascom, St. Louis, Mo., for petitioner.
Curtis L. Mann, Clayton, Mo., Trustee in Bankruptcy.
Gerald A. Rimmel, St. Louis, Mo., for Trustee.

ORDER
REGAN, District Judge.
By this petition for review, Tower Grove Bank and Trust Company (Bank) challenges the correctness of the order of the Referee in Bankruptcy dated April 29, 1969[*] adjudging in substance that a certain check in possession of Bank is an asset of the bankruptcy estate of Security Products Company (Security) and directing Bank to endorse and deliver same to the trustee in bankruptcy.
The check in question, in the amount of $9,765, is payable to the order of Bank and Security and was drawn by W. B. Fosson & Sons in payment of an account for certain work performed by bankrupt under a contract to furnish and install windows. The account had theretofore on May 21, 1965, been assigned by Security to Pauly Jail Building Company (Pauly) and immediately reassigned by Pauly to Bank to secure, in part, a note executed by Pauly for moneys loaned by Bank to Pauly. No money was paid to Security for the assignment. The Referee found that the assignment by Security was made without consideration and constituted a fraudulent transfer voidable by the Trustee.
The sole controverted issue before the Referee, ruled adversely to Bank, was whether the corporate entity of Security should be disregarded so that, deeming Pauly and Security to be the same corporation, the consideration paid to Pauly would constitute consideration to Security. Both corporations were adjudicated bankrupt on July 22, 1965, in separate voluntary proceedings.
In its petition for review, Bank now also questions the sufficiency of the evidence to support certain other essential facts found by the Referee, namely, (1) that at the time of the assignments of the account and continuously thereafter to the date of bankruptcy, Security was insolvent, (2) that at the time of the assignment, Security owed debts to creditors other than Pauly, some of which debts were unpaid at the time of bankruptcy, and (3) that Charles Bealke, Bank's vice-president, acting on its behalf, had knowledge at the time of the assignments that both Security and Pauly were insolvent and that Security received no consideration for the assignment.
We have carefully studied the entire record transmitted to us by the Referee and are convinced that there is substantial evidentiary basis for each of the Referee's findings. There can be no doubt that under the record Security and Pauly were insolvent long prior to May 21, 1965, the date of the assignments and continuously thereafter to July 22, 1965, the date of bankruptcy, and that Mr. Bealke, the Bank's authorized representative, was fully aware thereof at all times. There can also be no doubt that at the time of the assignments Security owed provable debts to creditors other than Pauly and that at least some of these debts were unpaid at date of bankruptcy.
This brings us to the final question decisive of the issues before the Referee, namely, whether the consideration which passed to Pauly should be deemed consideration to Security, a question which can be resolved in favor of the Bank only if the corporate entity of Security is disregarded. The Referee has fully treated this question in his memorandum opinion and we agree with his findings and conclusions.[*] To disregard the separate entity of Security at the instance of Bank would clearly prejudice the rights of Security's creditors, other than Pauly, and work an injustice upon them. The findings of the Referee are not clearly erroneous and the result he reached is the proper one under the record.
*112 Accordingly, it is hereby ordered that the order of the Referee dated April 29, 1969, be and it is hereby approved and confirmed in all respects.

APPENDIX

United States District Court Eastern District of Missouri Eastern Division
 In the Matter of |
 SECURITY PRODUCTS COMPANY, | In Bankruptcy
 |
 >
 | No. 65B-1597
 |
 Bankrupt. |
 |

MEMORANDUM OPINION
Pending for determination is the Petition For An Order To Determine Interest In Funds, filed on January 4, 1966, by Tower Grove Bank and Trust Company, and the Petition Of Trustee For Order On Tower Grove Bank and Trust Company To Turn Over Funds, filed on February 23, 1966. By such respective petitions each antagonist seeks a determination in its (his) favor concerning the proceeds ($9,765.00) of a certain account receiveable, to be more specifically described hereinafter.
The matter came on for hearing on July 12, 1966, before Referee William O'Herin, now retired, who took the matters under submission, with leave to the parties to file briefs. Briefs were filed by March 31, 1967. The matters were resubmitted to the undersigned Referee on December 26, 1967, upon the same evidence upon which the matters were submitted to Referee O'Herin.

PLEADINGS
Petitioner, Tower Grove Bank and Trust Company, hereinafter referred to as the bank, alleges in its Petition that it has since November 19, 1965, held and now holds a check for $9,765.00, now certified, issued by W. B. Fosson & Sons, Ashland, Kentucky (hereafter referred to as Fosson); that the check is payable to Security Products Co. and to the bank (Security Products Co. is hereafter referred to as the bankrupt); and that the trustee in bankruptcy of the bankrupt refuses to endorse the check to the bank.
The bank further alleges that it is entitled to the proceeds of the check by reason of (1) the bankrupt's assignment of its account receivable from the Fosson company, to Pauly Jail Building Company (hereafter referred to as Pauly); (2) the assignment, in turn, of the account by Pauly to the bank on May 21, 1965, (3) for valuable consideration.
The bank prays for an order that it is entitled to the proceeds of the check, and an order requiring the trustee's endorsement to the bank of that check.
To such petition, the trustee filed an Answer, on February 23, 1966, admitting the creditor-debtor relationship of the bankrupt and Fosson; the amount of the Fosson indebtedness to the bankrupt, $9,765.00; the bank's receipt of the Fosson check for $9,765.00; and his refusal to endorse the check payable to the bank. He denies, in that Answer, all other material and substantive allegations, praying for an order that the bank has no interest in the check and that the bank endorse and deliver the check to him as an asset of this bankruptcy estate.
In the same pleading instrument, the trustee filed his Petition Of Trustee For Order On Tower Grove Bank And Trust Company To Turn Over Funds, in four counts, praying in each for an order that *113 the alleged assignments of the account receivable due by Fosson are null and void as to the trustee, that the bank be ordered to endorse and deliver the check to the trustee as an asset of the bankruptcy estate, and that the bank has no interest in or lien upon the Fosson account or check.
Each count alleges certain facts which the trustee claims to support a legal theory. The trustee's allegations, and proof in respect thereof, in each count of his said Petition, will be discussed hereafter.
To his Petition, the bank filed its Answer, on April 19, 1966, praying ultimately that the trustee's Petition be dismissed. The bank's allegations, admissions, etc., will be discussed hereafter.

EVIDENCE
At the hearing before Referee O'Herin, on July 12, 1966, the parties submitted the matters on a written Stipulation, which contains matters of fact. Also, by that Stipulation, testimony adduced, and exhibits received into evidence, at earlier hearings, were offered as evidence in respect of such matters; and, all other items and matters of record, which were to be judicially noticed in respect of an earlier hearing (February 16, 1966), were offered. The evidence will not be described in detail here, but will be discussed infra, as need be.

LAW

Count I (of trustee's petition)
In Count I of his Petition, the trustee alleges that on or about May 21, 1965[1], the bankrupt purportedly assigned the Fosson account to Pauly; that Pauly was then the sole stockholder of the bankrupt, or the dominant and controlling stockholder of the bankrupt; that on the same date Pauly purportedly assigned the Fosson account to the bank; that the purported assignments were done contemporaneously by the same officers, reflected in one instrument, and constituted on transaction, for the purpose of enabling Pauly to use bankrupt's assets to borrow from the bank; and that the bank knew, or in the exercise of ordinary business judgment and prudence should have known, such facts and purposes. (para. 1)
The trustee alleges, further, that the bankrupt did not receive any money, labor or property, nor any consideration whatsoever, for the alleged assignment, from Pauly, from the bank, or from anybody. (para. 2)
He alleges further that neither Pauly nor the bank filed a notice of the alleged assignment with the Secretary of State of the State of Missouri; and further that neither gave actual notice of the alleged assignment to Fosson, the debtor, so that the alleged assignment was not valid under Chapter 410, RSMo 1959, V.A.M.S., in particular Sec. 410.020, and thus null and void as to him, the trustee by virtue of the provisions of Section 70, sub. c of the Bankruptcy Act, Sec. 110(c), Title 11 U.S.C.A. (para's. 3 and 4)
In its Answer to said Count I, the bank admitted all of the allegations in paragraph 1, except that it denied that the two alleged assignments were in fact one transaction for the purpose of enabling Pauly to use bankrupt's assets to borrow money, and denied that the bank knew or should have known such purpose. The bank admitted (in response to paragraph 2) that the bankrupt did not receive any money, labor or property for the assignment but denied that the bank did not give any consideration therefor to the bankrupt. The bank denied (in response to paragraph 3) that notice of the assignment was not filed, and expressly denied violating Chapter 410, RSMo 1959, V.A.M.S. It denied (in response to paragraph 4) that the assignment(s) was (were) null and void as to the trustee.
In their respective briefs, the parties have treated Count I as asserting, only, the contention that the purported assignment(s) was (were) invalid, because *114 not perfected as to third parties, because of a failure to comply with the provisions of Chapter 410, RSMo 1959, V.A.M.S., particularly Sec. 410.020 thereof.
I shall so treat Count I.
In the written Stipulation, filed by the parties on July 12, 1966, they agreed that the letter dated May 28, 1965, from Charles E. White, Assistant Vice-President of the bank, to Fosson, which letter is attached to the bank's Petition, was sent by the bank and received by Fosson no later than June 3, 1965.[2]
This letter advises Fosson of the assignment to the bank of amounts due from it, aggregating $31,605.00 and refers to the enclosure of "a copy of the most recent invoice assigned to us for your information". Bankrupt's invoice, dated May 21, 1965, for $9,765.00 manifests the account in controversy. It is attached, too, to the bank's Petition. The evidence, however, does not describe this invoice as the invoice referred to in the bank's letter. The trustee does not, however, pursue the point (of lack of proof), and for purposes of decision I find that the bank's letter of May 28, 1965, constitutes notice to Fosson of the assignment to the bank of bankrupt's invoice dated May 21, 1965 to Fosson and of the account manifested thereby.
This notice, it is stipulated, was received by Fosson on or before June 3, 1965, prior to bankruptcy. The giving and receipt of such notice perfected the assignment, by reason of the provisions of Section 410.020, RSMo 1959, V.A.M.S., which provides:
"All such assignments may be perfected in any one of the ways herein set forth and upon being so perfected shall be enforceable against and valid and binding upon all creditors of the assignor and all assignees and purchasers who have not theretofore perfected their rights in one of said ways herein provided. The ways in which such assignments may be perfected as aforesaid are as follows:
(1) By actual notice to the debtor owing the assigned account receivable, even though no notice be filed as permitted hereby;
(2) * * *"
Consequently, trustee's contention in Count I is without merit.

Count II
In this Count, the trustee alleges that bankrupt's assignment of the Fosson account, under the circumstances alleged in paragraphs 1 and 2 of Count I, is ultra vires, and contrary to the Constitution of Missouri, 1945, Article XI, Section 7, V.A.M.S.; and Sections 351.160 and 351.165, RSMo 1959, V.A.M.S.
Section 7 of the Constitution, supra, provides:
"No corporation shall issue stock, or bonds or other obligations for the payment of money, except for money paid, labor done or property actually received; and all fictitious issues or increases of stock or indebtedness shall be void; provided, that no such issue or increase made for valid bona fide antecedent debts shall be deemed fictitious or void. The stock or bonded indebtedness of corporations shall not be increased nor shall preferred stock be issued, except according to general law."
Section 351.160, supra, similarly provides, in substance.
In my judgment, bankrupt's assignment of the Fosson account, or invoice, to Pauly does not constitute a prohibited issuance of stock, bonds or other obligations for the payment of money within such provisions. Made without any consideration from Pauly, it constitutes merely a loan to Pauly, its stockholder. In that respect, Section 351.165, supra, provides:
"* * * and no loan of money shall be made by the corporation to any shareholder therein; and if such loan *115 shall be made to a shareholder, the officers making it, or who shall assent thereto, shall be jointly and severally liable to the corporation for the repayment of such loan and interest."
Such a statute is directory only, and loans made in contravention thereof are not void. The penalty therefor is that prescribed by the statute. Holt v. Queen City Loan & Investment, Inc. (Mo.Sup., 1964) 377 S.W.2d 393, 400. There's nothing in this statute to avail the trustee, in my judgment. And, none of the cases [Cass Bank & Trust Co. v. Sheehan (8 Cir., 1938) 97 F.2d 935; Ward v. National Ice Cream Co. (Mo.Sup., 1922) 246 S.W. 554; Hunter v. Garanflo (1912) 246 Mo. 131, 151 S.W. 741; and National Tube Works Co. v. Ring Refrigerating & Ice Machine Co. (1893) 118 Mo. 365, 22 S.W. 947] is analogous.
In Count II, following allegations of fact, the trustee alleges (in para. 6) that the assignments are void as against the trustee, by reason of the provisions of Section 70 of the Bankruptcy Act, Sec. 110(e), Title 11 U.S.C. Insofar as such allegations may be considered to raise something other than an "ultra vires" defense, they will be considered, infra, in connection with the trustee's Count III.

Count III
In this Count, the trustee alleges that the bankrupt assigned the Fosson account to Pauly on or about May 21, 1965; that Pauly then was the sole stockholder of the bankrupt, or the dominant or controlling stockholder of the bankrupt; that on the same date Pauly assigned the Fosson account to the bank; that the assignments were done contemporaneously by the same officers, reflected in one instrument, constituted one transaction, for the purpose of enabling Pauly to use bankrupt's assets to borrow from the bank; and that the bank knew, or in the exercise of ordinary business judgment and prudence should have known, such facts and purposes. He alleges, further, that the bankrupt did not receive any money, labor or property, nor any consideration whatsoever from Pauly, from the bank, nor from anybody for the assignment; that the assignment by bankrupt to Pauly was solely for Pauly's benefit and use, bankrupt receiving no benefit therefor whatsoever, to enable Pauly to borrow money from the bank, all of which was known to the bank or should have been known to it (para. 3).
He alleges further that at the time of the assignment from the bankrupt to Pauly, and then to the bank, the bankrupt had creditors who, at bankruptcy, had claims provable under the Bankruptcy Act, which claims existed at the time of such assignments (para. 4); that at such time the bankrupt did not have means to meet its liabilities, so that under Missouri law the voluntary conveyance from the bankrupt to Pauly was fraudulent and void (para. 5) and under Section 70, sub. e of the Bankruptcy Act, supra, null and void as to him.
In its answer thereto, the bank denied that the assignment constituted one transaction for the purpose of enabling Pauly to use the bankrupt's assets to borrow money, and denied that the bank knew or should have known such purpose; admitted that the bankrupt "received no money, labor or property for the assignment alleged", but denied that the bank did not give any consideration to the bankrupt "therefor", and denied the allegations in paragraphs 3 through 6 of said Count.
In respect of the trustee's right to prevail under this Count III, the bank's contention, as manifested in its briefs, is, only, that the bankrupt received consideration for its assignment of the Fosson invoice or account by reason of (1) the bank's advance of money to Pauly on the assignment of the Fosson account by Pauly to the bank, and (2) the relationship of the companies one to the other, requiring that the bankrupt's corporate identity be disregarded, so that (3) the bank's advance to Pauly is consideration to the bankrupt. If so, the bank contends, the assignments are not fraudulent, and are not voidable by the trustee.
*116 At this point, the bank's failure to contend[3] that bankrupt's assignment to Pauly was not a voluntary conveyance; and was not fraudulent as to its (bankrupt's) creditors; and that the bank, as transferee from Pauly, did not act in concert with Pauly, the fraudulent transferee, nor advance funds to Pauly upon the assignments without knowledge of bankrupt's insolvency and the voluntary character of bankrupt's assignment to Pauly, so that even if the assignment from bankrupt to Pauly were voidable (as in fraud of bankrupt's creditors), the subsequent transfer by assignment, for consideration, from Pauly to the bank, is not voidable by the trustee; must be noted.[4]
Bankrupt's separate corporate entity is to be disregarded, the bank contends, because Pauly owned all of bankrupt's capital stock; because the officers and directors of the two companies were the same; because of the shifting of funds from one to the other; because the bankrupt did not have any employees, or office facilities other than the office facilities of Pauly; and because of other factors described by the bank at pages 10, 11 and 12 of its principal brief, filed on October 10, 1966. As authority for its contention, the bank cites Fletcher, Encyclopedia of Corporations, Vol. 1 (Perm.Ed.Rev. Vol. 1963) Sec. 43; Maule Industries, Inc. v. Gerstel (5 Cir., 1956) 232 F.2d 294; Soviero v. Franklin National Bank of Long Island (2 Cir., 1964) 328 F.2d 446; and Consolidated Sun Ray, Inc. v. Oppentstein et al. (8 Cir., 1964) 335 F.2d 801. The cases *117 cited are not in point in respect of the matters in issue here.
To illustrate: in Maule Industries, Inc., supra, a creditor of the "parent" corporation (Ludwig Corporation) filed an application in the "parent's" bankruptcy proceeding, praying for the consolidation of the "parent" and Ludwig Bros., Inc., (an alleged subsidiary) and for an order on a state-court appointed receiver of the alleged subsidiary to turn over the subsidiary's assets to the "parent's" trustee in bankruptcy. The application was sustained by the referee, who was reversed by the District Court. This reversal was affirmed by the Court of Appeals, but on different grounds: i. e., that the applicant had not proved a case for equitable relief. As said in that opinion:
"Courts are reluctant to pierce the corporate veil and destroy the important fiction under which so much of the business of the country is conducted, and will do so only under such circumstances as require such action to avoid protecting fraud, or defeating public or private rights." 232 F.2d loc. cit. 297
Continuing, the Court said that the applicant had the burden of proof to establish that the alleged subsidiary is
"`An artifice and a sham designed to execute illegitimate purposes in abuse of the corporate fiction and the immunity that it carries.' (cases)" loc. cit. 297
Continuing, the Court stated:
"The factors commonly considered as requisite to establish that one corporation is an instrumentality of another for purpose of a turnover of its assets to the trustee in bankruptcy are well expressed in Fish v. East, 10 Cir., 1940, 114 F.2d 177, 191.[5] Moreover, the petition and the proof must show that the corporation whose property is sought to be brought into the bankruptcy proceeding was organized or used to hinder, delay or defraud the creditors of the bankrupt, and constitutes mere `legal paraphernalia' observing form only and not existing in substance or reality as a separate entity. Cf. Sampsell v. Imperial Paper & Color Corp., supra." loc.cit. 297 (footnote, and emphasis, supplied)
The Soviero case, supra, is also a case involving the turn over to the "parent" corporation's trustee in bankruptcy of the assets of 13 "subsidiary" corporations.
Latty, in his treatise, Subsidiaries and Affiliated Corporations (1936), in Chapter III, Sec. 9, pp. 42 et seq., says that there may be factors in particular cases which justify a bankruptcy court's bringing into the "parent" corporation's bankruptcy proceeding, for administration, the assets of subsidiaries, even where each of the corporations has its separate set of creditors. Nevertheless, he further says that such a turn over is not tantamount to a decision that all of the creditors must share in the aggregate assets pari passu which is to say that a subsidiary's separate corporate existence may be disregarded for some purposes but not necessarily for all purposes. He says:
"The existence of separate creditors of the subsidiary complicates matters; the existence of this creditor group whose interests the law must protect introduces factors which may make a court hesitate in allowing turn over. Yet in some circumstances even here there may be justification for allowing turn over, at least so long as one does not confuse the mere fact of the turn over of the property to the parent's receiver with the problem of what to do with the property so turned over * * (p. 46) And where there are creditors of the subsidiary there is very little in the decided cases to suggest that the creditors of both parent and subsidiary are forced to share in the aggregate assets pari passu. (p. 49) * * * Though ordinarily the issue of recognition *118 of priorities is not determined in a turn over case, the few cases that do touch upon the problem indicate that priorities will be observed. This is well brought out in a recent case where the court allowed turn over of the subsidiary's property to the parent's receiver but held that the priority of the subsidiary's creditors in the subsidiary's assets should be preserved.[6] This holding is sound and in harmony with dicta in several cases.[7]" (footnotes supplied)
Thus, the rights of the subsidiary's creditors vis a vis the creditors of the "parent" corporation are not ignored even where sufficient reason exists for the administration upon the subsidiary's assets in the parent's bankruptcy proceeding. And to that extent, the separate corporate existence of the subsidiary is not being disregarded.
The Consolidated Sun Ray case, supra (cited by the bank) does not support the bank's contention. To the contrary, it illustrates the point that creditors of a controlled subsidiary are to be protected and that a separate corporate entity will be ignored if necessary to afford that protection. This case involved the question of the parent corporation's liability, for damages, for the subsidiary's breach of a lease. (Here, the plaintiff was the lessor, the subsidiary the lessee.) The evidence showed that Consolidated (the parent), after the term of the lease began, completely and absolutely controlled the lessee, and used that power and control for its benefit and not for the benefit of the lessee; treated the lessee as a division, department or adjunct and not as a separate corporate entity, making the lessee the alter ego of the parent; imposed excessive financial burdens on the lessee as a result of all of which the lessee was unable to protect its own assets, lost control over its own destiny, which worked an injustice to the plaintiff. Accordingly, the plaintiff's recovery of judgment, for damages, against the parent, was affirmed.
The Consolidated Sun Ray case is the converse of the case at issue. There, equity came to the aid of the subsidiary's creditor where to acknowledge its separate corporate existence would work an injustice upon the creditor. But for this court to disregard the bankrupt's separate entity is tantamount to prejudicing the rights of bankrupt's creditors (creditors of a controlled subsidiary). Such is not the teaching of the Consolidated case. As there said, 335 F.2d loc. cit. 806, 807, quoting from May Department Stores Co. v. Union Electric Light & Power Co. (1937) 341 Mo. 299, 107 S.W.2d 41, 55:
"`It does seem, however, that the determination of whether there is a case for equitable relief could and should be decided by the test of whether or not the arrangement involved is being used for a proper purpose. Should not all these other suggested tests be used only as aids for determining the true purpose of the arrangement? Making a corporation a supplemental part of an economic unit and operating it without sufficient funds to meet obligations to those who must deal with it would be circumstantial evidence tending to show either an improper purpose or reckless disregard of the rights of others. Equity sets aside legally sufficient conveyances if their purpose is to defraud creditors. If any intercorporate affiliation is devised for or is being used to accomplish an improper or unlawful purpose, certainly equity does have the authority to tear down technical legal barriers and reach beyond them to impose liability or grant proper relief. If the purpose is lawful, and fair and equitable to those with whom it is intended to deal, legal forms and relationships should be observed. Men have the right to use *119 legal forms which they believe to be helpful in accomplishing property purposes.' (Emphasis supplied.)"[8]
Upon the record made in the matter at issue, it is my judgment that to disregard bankrupt's corporate entity would be to disregard the rights of its creditors and to permit an injustice to be worked upon them. That record does not show, in my judgment, that bankrupt's creditors will be inequitably or unjustly enriched if its (the bankrupt's) separate corporate existence is not ignored or disregarded. Such a record does not warrant the equitable relief requested by the bank. See Sampsell v. Imperial Paper & Color Corp. (1941) 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293.
Accordingly, the assignments of the Fosson invoice or account from the bankrupt to Pauly, and then from Pauly to the bank, were in fraud of the bankrupt's creditors, and voidable by them. Under Section 70, sub. e of the Bankruptcy Act, Sec. 110(e), Title 11 U.S.C., the trustee succeeds to that right (to avoid the assignments), and he is entitled to recover upon his Count III. So being entitled to recover, the bank's petition must be denied.

Count IV
In this Count, the trustee alleges that the assignments, under circumstances alleged (similar to the circumstances alleged in Count III), are fraudulent as to bankrupt's creditors, and voidable by him by reasons of the provisions of Section 67d of the Bankruptcy Act, Sec. 107(d), Title 11 U.S.C. The bank's answer, in the main, is a denial of the alleged circumstances.
In respect of this Count IV, the bank argues, only, as it did in respect to Count III, that its advance or loan of money to Pauly constitutes consideration to Security, because its separate corporate entity is to be disregarded. The bank does not otherwise contend that Section 67, sub. d is without application, nor that it is a protected bona fide purchaser within the meaning of Section 67, sub. d(6).
Section 67, sub. d(2) of the Act provides:
"Every transfer made * * * by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act * * * is fraudulent (a) as to creditors existing at the time of such transfer * * *, if made * * * without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; or * * *"
For reasons stated in respect of Count III, bankrupt's assignment of the Fosson invoice or account is fraudulent as to its creditors, and is fraudulent under this Section. Further, for reasons so stated in respect of Count III, the separate corporate existence of the bankrupt is not to be disregarded, so that Pauly's assignment to the bank, of the Fosson invoice or account, is voidable by the trustee under this Section, there being no *120 claim made otherwise, by the bank, that it is a bona fide purchaser.
The trustee, then, is entitled to recover upon this Count IV, also, and the bank's petition must be denied.
Trustee's counsel is hereby directed to furnish this court, within 15 days of his receipt of a copy of this opinion, for entry by this Court, findings of fact and conclusions of law, consistent with this opinion, and an appropriate order.
Dated, at Saint Louis, this 8th day of April, 1969.
 /s/ Robert E. Brauer
 Referee in Bankruptcy

FINDINGS OF FACT AND CONCLUSIONS OF LAW
A Memorandum Opinion having been filed, on April 8, 1969, in respect of the issues raised by a Petition For An Order To Determine Interest in Funds, filed by the Tower Grove Bank and Trust Company, by the trustee's Answer thereto, and by the Petition Of Trustee For Order On Tower Grove Bank and Trust Company To Turn Over Funds, this court hereby makes its findings of fact and states its conclusions of law:

FINDINGS OF FACT
1. That the bankrupt above named (hereafter referred to as the bankrupt, or as Security) filed its voluntary petition in bankruptcy in this Court on July 22, 1965.
2. That Pauly Jail Building Company (hereafter referred to as Pauly) filed its separate petition in bankruptcy in this Court on July 22, 1965.
3. That on July 22, 1965, and at all times up to the date of bankruptcy, mentioned in these Findings of Fact and conclusions of Law, and at all times, up to bankruptcy, mentioned in the Memorandum Opinion of this court, filed on April 8, 1969, Security and Pauly were Missouri corporations, actively engaged in business, with the principal office of each in St. Louis, Missouri.
4. That on May 21, 1965, the bankrupt rendered an invoice to W. Fosson & Sons, Ashland, Kentucky, for $9,765.00, for APW-40C(V) Aluminum Security Windows and Erection to date, the invoice manifesting a progress billing for the part performance by the bankrupt under a contract to furnish and install windows.
5. That on May 21, 1965, an assignment of the invoice was executed on behalf of the bankrupt, in words as follows:
"For value received, we hereby assign to the Pauly Jail Building Company the amount of this invoice.
 SECURITY PRODUCTS COMPANY
 /s/ E. C. Albrecht
 Vice-President
 /s/ Shannon L. Orchard
 Controller "
6. That on May 21, 1965, an assignment of the invoice was executed on behalf of Pauly, in words as follows:
"For value received, we hereby assign to the Tower Grove Bank & Trust Company the amount of this invoice.
 PAULY JAIL BUILDING COMPANY
 /s/ E. C. Albrecht
 Vice-President
 /s/ Shannon L. Orchard
 Controller "
7. That the assignments referred to in paragraphs 5 and 6 of these Findings are written or typed across the face of the invoice, referred to in paragraph 4 of these Findings, and were done contemporaneously.
8. That the bankrupt did not receive any money, labor or property or consideration of any kind for its assignment to Pauly; that no such consideration was received from Pauly nor from the Tower Grove Bank & Trust Company (hereafter referred to as the bank).
9. That the bank advanced funds to Pauly on its assignment to the bank of the amount of the bankrupt's invoice to said W. Fosson & Sons. The amount of the funds advanced is not disclosed in *121 the record, but on May 25, 1965, Pauly executed a promissory note, for $18,983.50, payable to the bank's order, and to secure that note, executed a separate written assignment of the said Fosson account ($9,765.00) and of another account, in the amount of $7,791.00, due from James A. Mann, Inc., Philadelphia, Pa. Such funds as were advanced were credited by the bank to Pauly's checking account in the bank.
10. That on May 28, 1965, the bank, by Charles E. White, its Assistant Vice President, prepared a letter, and on that date or shortly thereafter mailed that letter, addressed to W. B. Fosson & Sons, in words as follows:
 "W. B. Fosson & Sons
 P.O. Box 267
 Ashland, Kentucky
In re: Pauly Jail Building Company
Gentlemen:
Please refer to our letter of May 6, 1965, concerning the above captioned company. Please be advised that the amounts due from your company presently assigned to us by Pauly Jail Building Company now aggregate $31,605.00.
I have enclosed a copy of the most recent invoice assigned to us for your information.
Kindly make all future payments on these accounts directly to:
 Tower Grove Bank & Trust Company
 Discount Department
 3134 South Grand
 St. Louis, Missouri 63118
 Yours very truly
 Charles E. White
 Assistant Vice President
 CEW/st
 Enc. "
11. This letter was received by W. B. Fosson & Sons, addressee, no later than June 3, 1965.
12. That a general notice of the assignment of accounts receivable or of invoices or of amounts of invoices, by bankrupt to Pauly, or by Pauly to the bank, was not at any time filed with the Secretary of State of the State of Missouri.
13. That at the time of the assignments, referred to in paragraphs 5, 6 and 9 of these Findings, the bankrupt was insolvent, and continued to remain insolvent to bankruptcy.
14. That at the time of said assignments, the bankrupt owed debts to creditors other than Pauly, some of which debts were unpaid as of bankruptcy.
15. That Charles F. Bealke, a vice president of the bank, supervised, on behalf of the bank the bank's loan transactions with Pauly, and for a year or more prior to bankruptcy, frequently checked the bankrupt's and Pauly's books and records and had frequent consultations with Shannon Orchard, who was bankrupt's comptroller and Pauly's comptroller; that in such capacity, said Bealke knew that the bankrupt, and Pauly, each was insolvent at the time of said assignments, and knew that the bankrupt did not receive any consideration of any kind for its assignment of the Fosson invoice to Pauly; and that the bank, by reason of the knowledge of said Bealke, knew at the time of said assignments that bankrupt, and that Pauly, each was insolvent and that the bankrupt did not receive any consideration of any kind from Pauly for said assignment.
16. That on November 19, 1965, the bank received a check for $9,765.00 from W. B. Fosson and Sons in payment of bankrupt's invoice of May 21, 1965, referred to in paragraph 4 of these Findings; that this check is made payable to the bankrupt and to the bank; that the bank caused said check to be certified, on December 9, 1965; and that the bank has held said certified check in its possession since that time.
17. That on May 21, 1965, and since a time sometime prior to 1960, and to bankruptcy, Pauly was the sole stockholder of the bankrupt. Bankrupt continued to exist thereafter, since prior to 1960, as a corporate entity solely to take advantage of the surtax provisions of the Internal Revenue Code.
*122 18. Throughout the period, from sometime prior to 1960 and to bankruptcy, Security has sold special-order windows, and screens. Pauly during this period has been engaged principally in the manufacture and sale of jails, although it has too sold special-order windows[1]. The windows sold by Security have been manufactured by Pauly. The screens sold by Security were supplied primarily by outside suppliers. Security has had no separate manufacturing facilities and has manufactured nothing. Many of the windows sold by it are aluminum windows. Security purchased much of the aluminum used by Pauly in its manufacture of windows for Security, and the screens purchased from outside suppliers were purchased by Security, purchased upon orders issued by it and purchased on its own behalf. Payment, as for such of those materials as payment has been made, has been made by Security, upon checks drawn by it upon its separate checking account.
Security has not had any separate office or factory facilities nor factory or office employees. Pauly's employees performed all services, save for sales services, necessary for Security's transaction of its business; and occasionally a Pauly-paid employee solicited sales for Security. Security did not pay any of the salaries earned by the Pauly employees, except for a commission on a sale. Pauly paid such salaries. Neither Pauly nor Security allocated to Security the salary-cost for the time spent by Pauly's employees in Security's business, except as that cost was included in a 10% figure, to be referred to in greater detail infra. Security did pay, however, commissions and travel expenses to salesmen procuring orders for its windows, and paid freight on its shipments, and sales taxes.
As a matter of bookkeeping, Security has not owned any tangible personal property. Its assets have consisted of certain patents, fully depreciated on its books, and its accounts receivables. The aluminum, and screens, purchased by it, were carried, on receipt of such items, on Pauly's books as part of its inventory, at a figure which represented the cost to Security, i. e., without any markup or profit to Security.
19. A set of books has been maintained for each corporation. In each such set of books is found an inter-company account. To each account were made year-end adjustments, by which Pauly would charge Security for the Pauly manufacture of windows sold by Security; such charge amounted to Pauly's manufacturing cost, plus 10% for profit-to-Pauly and overhead. This 10% included the cost of all administrative services rendered by Pauly's employees to Security's operations, and whatever rental of facilities was attributable to Security. Security took credit, in these adjustments, for monies expended by it in payment for aluminum and screens purchased by it, salesman's commissions and allowances, and freight, and sales taxes.
In the year-end adjustments, Security accepted cost figures supplied by Pauly. No rent or telephone or other utility bills were paid for by Security, nor charged to Security, except as such were built into the 10%-of-cost charge previously referred to.
The inter-company accounts also reflected Security's "transfer" to Pauly of the materials Security had ordered and purchased, and in turn monies supplied by Pauly to enable Security to pay its bills. I assume, although the evidence does not clearly reflect this, that the accounts also reflect Security's assignment of its accounts receivables to Pauly.
20. Security has maintained an active checking account in the bank, but the balance on deposit has been kept at a nominally small amount, as a result of withdrawals therefrom which went into Pauly's bank accounts. Payments to Security on its accounts receivables, were usually deposited into Security's bank account, *123 but were ordinarily transferred out immediately into Pauly's bank accounts. In the last year of operations, Security's account was kept pretty well drained by Pauly.
As Security needed money, in excess of its bank balance at any time, whether to pay for its purchases, or to pay salesmen's commissions and allowances, freight charges, or sales taxes, funds would be transferred from Pauly's checking account into Security's account, so that checks could be issued by Security.
21. Each company (Security, and Pauly) has had the same officers and directors. Security has been considered a wholly-owned subsidiary, has been dominated by Pauly and treated as its baby brother. However, Security maintained its separate corporate existence in good standing with the State of Missouri, by filing the necessary reports and affidavits, until January 1, 1966, after bankruptcy. It also filed its separate income tax returns. Separate year-end financial statements were prepared for each company, but then consolidated.
22. During the last year of Security's and of Pauly's operations, invoices manifesting accounts receivables due each were promptly assigned to the bank in order for money to be advanced and received. Security's invoices, or accounts, were first assigned to Pauly, and then assigned by Pauly to the bank, in the manner as the Fosson invoice and account was handled. Such assignments of a particular Security invoice were made simultaneously. Security received nothing from the bank on any of such assignments. Such money as was loaned by the bank upon the assignment of a Security invoice or account was credited by the bank to Pauly's account in the bank. If Security needed money at the time of a particular assignment, part of the bank's advance might be transferred from Pauly's account to Security's account, on an as-needed basis only. The amount so transferred bore no relationship to the amount of the Security invoice or account assigned.
23. At bankruptcy, the inter-company accounts, previously referred to, reflected that Security owed Pauly $96,538.84. Security's bankruptcy schedules list other unsecured creditors, with debts totaling $247,456.59, including $3,023.53 due the bank on account of Security's overdrawn checking account.
24. In the last year of operations, Pauly was into contracts over its head, having underbid large contracts, although not all large contracts had been underbid. The bank continued its loan transactions, during that period, with Pauly in an attempt to salvage the sinking ship.

CONCLUSIONS OF LAW
1. That the letter of Tower Grove Bank and Trust Company, dated May 28, 1965, constituted notice to W. B. Fosson and Sons of the purported assignment to the bank of Security Products Company's invoice dated May 21, 1965, and of the account manifested thereby.
2. That the giving and receipt of this notice on or before June 3, 1965, prior to the bankruptcy of Security Products Company, perfected the assignment of the account by reason of the provisions of Section 410.020, RSMo 1959, V.A.M.S., then in full force and effect.
3. That the assignment of the Fosson account, or invoice, by Security Products Company to Pauly Jail Building Company did not constitute a prohibited issuance of stock, bonds or other obligations under Sec. 7, Art. XI, Mo. Constitution 1945, or Sections 351.160 and 351.165, RSMo 1959, V.A.M.S., but was merely a loan and although in contravention of Section 351.165, RSMo 1959, V.A.M.S., was not void.
4. That the assignment by Security Products Company of the Fosson account to Pauly Jail Building Company without consideration at a time when it was insolvent was in fraud of the creditors of Security Products Company then in existence and whose debts were still due and unpaid on the date of bankruptcy.
*124 5. That Tower Grove Bank and Trust Company was aware at the time of the assignment to it of the Fosson account of the facts which operated to make the assignment by Security Products Company to Pauly Jail Building Company fraudulent.
6. That the Tower Grove Bank and Trust Company was not a bona fide purchaser of the Fosson account for a valuable consideration.
7. That the assignments of the W. B. Fosson and Sons invoice or account from Security Products Company to Pauly Jail Building Company, and then from Pauly Jail Building Company to the Tower Grove Bank and Trust Company, were in fraud of the creditors of Security Products Company, and voidable by them; that under Section 70, sub. e of the Bankruptcy Act, Section 110(e), Title 11 U.S.C., the trustee succeeds to that right to avoid the assignment.
8. That the assignments of the W. B. Fosson and Sons invoice or account from Security Products Company to Pauly Jail Building Company and then from the latter to the Tower Grove Bank and Trust Company are fraudulent as to the creditors of the bankrupt under Section 67, sub. d of the Bankruptcy Act, Sec. 107 (d), Title 11 U.S.C. and by reason of Section 70, sub. e of the Bankruptcy Act, Sec. 110(e), Title 11 U.S.C., such assignment of the invoice to the bank is voidable by the Trustee of Security Products Company.
9. That the bankrupt is a corporation whose separate corporate existence is not to be disregarded.
10. That the advance of funds by the bank to Pauly upon its assignment of the Fosson invoice, or account receivable, was not consideration to Security.
11. That the trustee is entitled to recover upon Count III and upon Count IV of his Petition For Order On Tower Grove Bank and Trust Company to Turn Over Funds and that judgment shall be in favor of the Trustee and against the Bank and the Bank's petition for the same funds must be denied.
12. That the certified check issued by W. B. Fosson and Sons in the amount of $9,765.00 and now in the possession of the Tower Grove Bank and Trust Company is the property of the Trustee and that said bank shall be compelled to endorse check and deliver it to the Trustee and that said bank has no interest therein nor lien thereon.
 (s) Robert E. Brauer
 Referee in Bankruptcy

ORDER
A Petition For An Order To Determine Interest In Funds, having been filed by Tower Grove Bank and Trust Company, on January 4, 1966, and a Petition Of Trustee For Order On Tower Grove Bank and Trust Company To Turn Over Funds, having been filed by the trustee in bankruptcy on February 23, 1966; and a separate memorandum opinion in respect thereof having been filed on April 8, 1969, and separate Findings of Fact and Conclusions of Law having been filed this date; it is ordered
1. That said Petition For An Order To Determine Interest In Funds, insofar as it prays for an order that said Tower Grove Bank and Trust Company is entitled to the proceeds of the check, referred to more specifically hereinafter, and an order requiring the trustee's endorsement to the bank of that check, be and it hereby is denied.
2. That Counts I and II of the said Petition Of Trustee For Order On Tower Grove Bank and Trust Company To Turn Over Funds be, and each of said Counts hereby is, denied.
3. That Counts III and IV of the trustee's said Petition be, and each of said Counts hereby is, granted, and
4. The Tower Grove Bank and Trust Company be and it hereby is ordered and directed to endorse the certified check for $9,765.00, issued by W. B. Fosson and Sons, Ashland, Kentucky, now in its possession, and to deliver such endorsed check to Curtis L. Mann, trustee in bankruptcy of Security Products Company.
*125 It is further ordered, adjudged and decreed that said check and the proceeds therefrom be and the same are the sole property of the said trustee in bankruptcy, that said Tower Grove Bank and Trust Company have no interest therein nor lien thereon, and that said trustee administer upon said check and the proceeds therefrom as an asset of this bankruptcy estate.
 (s) Robert E. Brauer
 Referee in Bankruptcy
NOTES
[1] Bankrupt's voluntary petition in bankruptcy was filed on July 22, 1965.
[1] Bankrupt's voluntary petition in bankruptcy was filed on July 22, 1965.
[2] Prior to bankruptcy.
[3] Assuming that bankrupt's separate corporate identity is not to be ignored or disregarded.
[4] The Missouri substantive law relating to transfers, or conveyances, in fraud of the transferor's creditors, is set forth in Hartman v. Lauchli, Trustee (8 Cir. 1956) 238 F.2d 881, 888, 889. As stated there, a voluntary conveyance without consideration is presumed to be fraudulent, as to existing creditors of the transferor; and when such is shown, the party attacking the transfer makes a prima facie case, and the burden of going forward with the evidence to show that the conveyance was not fraudulent, including the fact that the grantor was not insolvent at the time of the conveyance, nor rendered so by it, passes to and rests upon the party who received the conveyance. The evidence, in the matters presently under consideration, clearly shows that Pauly paid nothing to the bankrupt for the assignment; that at the time of it, the bankrupt-assignor was insolvent; and that creditors (of the bankrupt) in existence then still have their debts then due unpaid. Consequently, if the separate corporate identity of the bankrupt is not to be disregarded, bankrupt's assignment to Pauly was in fraud of its creditors. Nevertheless, even then Pauly's subsequent transfer of the Fosson invoice or account to the bank, for consideration, could not be avoided by the trustee if the bank is a bona fide purchaser: i. e., one buying, for valuable consideration, without notice of the bankrupt's-transferor's fraud. Wineland v. Coonce (1838) 5 Mo. 296; Gentry v. Robinson (1874) 55 Mo. 260; Gordon v. Ritenour (1885) 87 Mo. 54, 61; Miller v. Allen (Mo.Sup., 1917) 192 S.W. 967; Allison v. Mildred (Mo. Sup., 1957) 307 S.W.2d 447. On the other hand, the assignments can be avoided, by the trustee, if the bank were aware at the time of the assignment to it of the facts which operate to make bankrupt's assignment to Pauly fraudulent, or were aware of such facts as would "put a man of common sagacity, care and prudence on his inquiry" [Reid, Murdock & Co. v. Lloyd & Moorman (1893) 52 Mo.App. 278, loc. cit. 283] and such inquiry would have led to knowledge of such facts. Hart et al. v. Parrish et al. (Mo.Sup., 1951) 244 S.W.2d 105, 109 (12), and cases cited. The evidence clearly shows that the bank, through its officer supervising the bank's loan transactions with Pauly, who had access to and frequently checked the books and records of the companies, knew at the time of the assignments that bankrupt, and Pauly, each was insolvent, and that no consideration whatsoever was received by the bankrupt, for its assignment, from Pauly nor from the bank. Consequently, the constituent facts, to avoid the assignments, are found in the record, unless bankrupt and Pauly are to be regarded as one. The bank's sole contention, in respect of Count III, then seems to be a recognition that the trustee has otherwise made his case.
[5] These are the 10 factors enumerated by the bank at pages 6 & 7 of its principal brief.
[6] Citing, in a footnote, Commerce Trust Co. v. Woodbury (8 Cir., 1935) 77 F.2d 478. To which may now be added, Anaconda Bldg. Materials Co. v. Newland, Trustee (9 Cir., 1964) 336 F.2d 625.
[7] Citing, in a footnote, In re Rieger, Kapner & Altmark (D.C.Ohio, 1907) 157 F. 609, 613; In re Eilers Music House (9 Cir., 1921) 270 F. 915, 925.
[8] The Missouri Supreme Court approves the analyses of cases by Latty in his treaties, cited at page 117 in the body of the opinion. At 107 S.W.2d loc. cit. 53, the Court says "* * * but the review of cases made by Professor Latty shows that neither ownership, dominance, nor control can be made the sole criterion; that many cases do, as Justice Cardozo noted, make an epithet the basis of decision;". Continuing, loc. cit. 54, the Court noted that "instrumentality" was perhaps the epithet most frequently employed, and says: "Since all corporations are in one sense instrumentalities of their stockholders, it does not state the true `ratio decidendi' to say that liability is imposed because a corporation is an instrumentality of its owner (corporate or individual) any more than to designate the arrangement as `hooey' or `horsefeathers'." Later, loc. cit. 55, the Court says "the question should not be merely `instrumentality,' but `instrumentality for what purpose.' Cases in many fields of the law turn on intent or purpose. `Things do not have to be in broad contrast to have different practical and legal consequences. Actions take estimation from degrees, and of this life and law are replete with examples.' Industrial Accident Commission v. Davis, 259 U.S. 182, 42 S.Ct. 489, 491, 66 L.Ed. 888."
[1] Hereafter, unless specially noted to the contrary, the facts set forth are found to have existed all throughout the period, from a time prior to 1960, to bankruptcy.