NELSON, District Judge.
 

 This appeal involves three corporations: Avtek Manufacturing Corporation (AMC), its parent company Avtek Incorporated (Avtek, Inc.), and the First National Bank of Boston (the bank). AMC and Avtek Inc. are both Rhode Island corporations; the former manufactured recreational vehicles in that state, while the latter was engaged primarily in the sale of snowmobiles in Vermont. In April of 1973, AMC terminated its operations and liquidated its assets. As
 
 *3
 
 discussed below, certain proceeds from the sale of its inventory, in the amount of $269,-077.91, were eventually paid to the bank in partial satisfaction of an outstanding loan to Avtek Inc. AMC’s creditors filed a petition in bankruptcy some eight months later, on December 21, 1973. Plaintiff, the trustee in bankruptcy of AMC, subsequently brought the present suit, claiming that the payment to the bank constituted a fraudulent conveyance under § 67(d)(2) of the former Bankruptcy Act, 11 U.S.C. § 107(d)(2) (1970).
 
 [1]
 
 The district court upheld the transfer on two independent grounds and entered judgment for the defendant bank. Plaintiff, represented by new counsel, filed this timely appeal. We affirm.
 

 I.
 

 Avtek, Inc., the parent of AMC, is in turn a subsidiary of Avtek Corporation (Avtek Corp.). This arrangement between Avtek Inc. and Avtek Corp. resulted from a merger in March of 1972. Prior to that time, Avtek Inc. was an independent company called Rodeo Incorporated (Rodeo). On June 8, 1971, Rodeo entered into a revolving loan and security agreement with the bank. As collateral for the bank’s financing, Rodeo granted a continuing security interest in,
 
 inter alia,
 
 its inventory, contract rights, accounts receivable, and “[a]ll other rights of the Borrower to the payment of money, now existing or hereafter arising.” This agreement authorized the bank to collect directly from a contract debtor of Rodeo. Subsequent to the merger between Avtek Corp. and Rodeo and the creation of Avtek Inc. as a subsidiary of Avtek Corp., the bank agreed to continue financing Rodeo (now Avtek Inc.) under the terms of the 1971 security agreement. As confirmed in a letter agreement dated April 5, 1972, Avtek Inc. in return agreed,
 
 inter alia,
 
 not to “make any loans or payments of any kind to Avtek Corp., or any of its subsidiaries or affiliates” without the bank’s prior permission. The revolving loan and security agreement with the bank constituted Avtek Inc.’s sole source of financing.
 

 AMC became a wholly-owned subsidiary of Avtek Inc. on December 8, 1972 when the latter purchased all of the stock of a company called Williamscraft of Rhode Island, Inc. and renamed it AMC. Throughout its short-lived period of operation, AMC acquired no independent source of financing and received all operating funds from Av-tek Inc. Except for a payroll account funded by its parent, AMC maintained no bank accounts. Avtek, Inc. paid all of AMC’s suppliers and creditors out of and deposited all funds received by AMC into its own bank account in Vermont.
 
 [2]
 
 In reflection of the disbursements by Avtek Inc. to or for its subsidiary, the intercompany accounts in Avtek Inc.’s balance sheets listed a debt of $479,650 as of January 27, 1973, and of $850,414 as of March 31, 1973. The statement of affairs of AMC, which accompanied the bankruptcy petition, listed Avtek Inc. as a creditor of AMC in the amount of $529,-670.
 

 Both parties stipulated, and the district court found, that this “downstreaming” of funds to its subsidiary violated Avtek Inc.’s agreement with the bank. In response to this violation, and in lieu of calling in the loan, the bank executed a second security agreement with both Avtek Inc. and AMC, under which it acquired a security interest
 
 *4
 
 in the inventory and accounts receivable of each company. This agreement, manifested in a letter dated February 2, 1973, was signed by Rodney Hughes, the president of Avtek Inc., and by Charles Shuff, the vice-president of AMC. On March 6, 1973, the Avtek Inc. board of directors adopted a corporate borrowing resolution which authorized and ratified agreements to borrow signed singly by Mr. Hughes. The AMC board of directors adopted an identical resolution that same day with respect to Mr. Shuff. Each company then executed and delivered to the bank U.C.C. financing statements which were subsequently filed. AMC ceased operations and liquidated its assets shortly thereafter. The proceeds from the sale of its inventory ultimately were used — as described further below — to repay part of the bank’s outstanding loan to Avtek Inc. The trustee contends that this transfer was fraudulent.
 

 II.
 

 Before the district court, both parties concentrated on the question of whether the 1973 security agreement created a security interest in,
 
 inter alia,
 
 the inventory of AMC. As articulated before us, plaintiff’s challenge to the validity of the 1973 agreement is two-pronged. First, he contends that the agreement only benefited Avtek Inc., by enabling it to continue borrowing from the bank; AMC received no fair consideration for the granting of a security interest, and the agreement was thus a fraudulent conveyance under 11 U.S.C. § 107(d)(2)(a) (1970).
 
 [3]
 
 Second, he argues that Shuff’s execution of the security agreement was neither authorized by the corporate by-laws nor subsequently ratified. In plaintiff’s view, the corporate borrowing resolution was adopted not to ratify Shuff’s action, of which neither AMC’s treasurer nor its general counsel was aware, but rather in connection with an anticipated direct line of credit between AMC and the bank. Moreover, he contends that the subsequent financing statement was executed for the same purpose; the security agreement thus was not only unauthorized but unperfected as well.
 

 The district court rejected plaintiff’s first argument, ruling that the downstreaming of funds to AMC provided adequate consideration for AMC’s transfer of a security interest. AMC benefited not only from the bank’s decision not to call the loan, an action that would have deprived Avtek Inc. and hence AMC of their sole source of financing, but also from the bank’s sanctioning of future downstreaming. The court declined to address plaintiff’s second argument, however. Instead, it relied on two other, alternative grounds for rejecting plaintiff’s claim. The court found as a factual matter that AMC transferred the proceeds from the inventory sale — not to the bank, as plaintiff had alleged — but rather to Avtek Inc., which deposited them in its Vermont bank account. Then, because the outstanding balance of the loan to Avtek Inc. totalled over $2,000,000 at the time, and in accordance with its customary procedure,
 
 see note 2 supra,
 
 Avtek Inc. in a separate transaction transferred the money to the bank to be applied against the loan. The court concluded that plaintiff “has no cause for complaint under the Bankruptcy Act for these successive transfers.” Since Avtek Inc. was both a creditor of AMC and
 
 *5
 
 a debtor of the bank, each transfer of funds was in partial satisfaction of an antecedent debt. Fair consideration therefore existed in both instances under the terms of 11 U.S.C. § 107(d)(1)(e) (1970).
 
 See
 
 note 3
 
 supra.
 
 Alternatively, the court suggested that defendant should prevail even if the proceeds did travel directly from AMC. The 1971 agreement gave the bank a security interest in, and the right to enforce directly, all rights of Avtek Inc. “to the payment of money, now existing or hereafter arising” — a category which was found to include AMC’s debt to its parent.
 

 III.
 

 On appeal, in addition to his several arguments regarding the validity of the 1973 security agreement, plaintiff advances various procedural and substantive objections to the district court’s rulings. The procedural challenges revolve primarily around the court’s finding of successive transfers. Because we believe this finding to be supported by the evidence and dispositive of plaintiff’s objections to the transfer of AMC’s assets,
 
 see
 
 Part IV
 
 infra,
 
 we treat plaintiff’s procedural challenges at length before proceeding to his substantive claims. He first alleges that the court erred in admitting evidence on this issue, since the parties had agreed before trial to limit the contested issues to those surrounding the validity of the 1973 agreement. Reference is made in this regard to a pretrial memorandum, signed by both sides and filed with the court at a conference on November 17, 1976, in which the parties designated nine “contested issues of law and fact.” Seven of those issues, it is true, involved the 1973 agreement, and an eighth simply raised a matter to which the parties had earlier stipulated. However, the final designated issue, which asked whether “there [was] any transfer of assets from AMC to [the bank] for less than a fair consideration,” would seem to have expanded the contemplated scope of inquiry beyond that described by plaintiff. That such provisions in a pretrial memorandum should be interpreted broadly cannot be gainsaid; even pretrial orders, specifically issued by the district court under Fed.R.Civ.P. 16, are “to be liberally construed to cover any of the legal or factual theories that might be embraced by their language.”
 
 Rodrigues v. Ripley Indus., Inc.,
 
 507 F.2d 782, 787 (1st Cir. 1974),
 
 citing
 
 6 C. Wright & A. Miller,
 
 Federal Practice & Procedure
 
 § 1527, at 609 & n.47 (1971). In any event, because the memorandum here was never specifically adopted by the court, any purported preclusion of issues therein cannot be viewed as restricting the court’s considerable discretion in this area.
 
 See, e. g.,
 
 6 C. Wright and A. Miller,
 
 supra,
 
 § 1527, at 608, 613-14.
 

 Second, plaintiff contends that the finding of successive transfers runs contrary to a pretrial stipulation, filed on September 20, 1977, in which the parties agreed “that the defendant received the proceeds of the sale of inventory ... at some time after March 17, 1973, and before July 1, 1973.” Pretrial stipulations are of course binding upon the signatories.
 
 E. g., Romero Reyes v. Marine Enterprises, Inc.,
 
 494 F.2d 866, 868 (1st Cir. 1974). However, we see no basis for upsetting the court’s conclusion that this stipulation only specified when, and not from whom, the bank received such money. The pretrial memorandum contained a corresponding stipulation stating that the bank “ultimately received at least some of the proceeds from the AMC property”; although similarly ambiguous, we think it can be read to buttress the court’s interpretation.
 

 Plaintiff’s final procedural argument concerns a motion to reopen discovery which he proffered, following the presentation of his case, once the court’s intended reliance on the successive transfer theory became evident.
 
 [4]
 
 Characterizing this theo
 
 *6
 
 ry as a “surprise” issue which neither party had anticipated, he contends that the court’s denial of such motion was an abuse of discretion. We disagree. Noteworthy is the fact that plaintiff conducted no discovery at all in the present case. In his brief, he ascribes this failure in part to the parties’ agreement in the pretrial memorandum to limit the issues in dispute.
 
 [5]
 
 To the contrary, the record indicates that the court ordered all discovery to be completed by October 15, 1975 — a date some thirteen months before the memorandum was filed. In any event, any purported “surprise” on plaintiff’s part as to the advent of this theory would seem unwarranted. Not only was plaintiff long aware that AMC’s receipts regularly were transferred to its parent’s account in Vermont, but in his own complaint he alleged that the proceeds from the inventory sale “were transferred, either directly or indirectly, to the Defendant.” This is not a situation, therefore, involving important new evidence that plaintiff in the exercise of due diligence could not earlier have uncovered. We also note that plaintiff failed to voice an immediate objection to defendant’s reliance on the successive transfer theory in its trial brief,
 
 see
 
 note 4
 
 supra,
 
 undertook no informal investigation of this uncomplicated factual question during the several months in which his motion was pending, and made no reference at trial to the court’s denial of the motion five days earlier. We see no basis for disturbing the trial court’s exercise of discretion in refusing to permit additional discovery some four and one-half years after the complaint was filed.
 
 See, e. g., Whittaker Corp. v. United Aircraft Corp.,
 
 482 F.2d 1079, 1085-86 (1st Cir. 1973);
 
 Eli Lilly & Co. v. Generix Drug Sales, Inc.,
 
 460 F.2d 1096,
 
 1105 (5th
 
 Cir. 1972).
 

 IV.
 

 The resolution of these procedural issues goes far toward disposing of the present appeal. As we indicated earlier, we find adequate support in the record for the district court’s finding that AMC’s assets moved to Avtek Inc. and then to the bank in two successive transfers. Of course, the district court’s reliance on the successive transfer theory necessitates an examination, not only of the bank’s involvement in this case, but also of the transaction between AMC and its parent Avtek Inc. With respect to the latter issue, if plaintiff were able to demonstrate error in the court’s finding that this initial transfer was valid, the bank would be entitled to retain the proceeds only if it fell within the proviso of 11 U.S.C. § 107(d)(6) (1970).
 
 [6]
 
 How
 
 *7
 
 ever, plaintiff offered little evidence below from which a fraudulent design could be inferred and he has devoted scant attention to this issue on appeal.
 

 Two of the statutory provisions pertaining to fraudulent conveyances are at issue. The first, of which mention was made above, see note 3
 
 supra,
 
 involves constructive fraud, rendering voidable any transfer made “without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent . . . . ” 11 U.S.C. § 107(d)(2)(a) (1970). In circumstances such as the present, “fair consideration” is said to exist “when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied . . . . ”
 
 Id.
 
 § 107(d)(1)(e). On appeal, plaintiff fails even to allude to this provision in the context of the initial transfer from AMC to Avtek Inc. He does, however, contend that AMC received no “fair equivalent” in exchange for granting a security interest to the bank through the 1973 security agreement — an argument that can be transposed to apply to the present inquiry. As such, we find it wanting. The district court, as noted above, found that Avtek Inc. had “downstreamed” substantial funds to AMC throughout the early months of 1973. As of March 31 of that year, Avtek Inc.’s intercompany accounts listed a debt of $850,414, of which $529,670 remained outstanding at the time AMC filed its statement of affairs in connection with the bankruptcy proceeding. Given this evidence, we have no difficulty upholding the court’s conclusion that AMC received a “fair equivalent” for the transfer of the proceeds to its parent, in the form of a corresponding reduction of this antecedent debt.
 
 [7]
 

 The second provision involves actual as opposed to constructive fraud, rendering voidable any transfer made “with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors.”
 
 Id.
 
 § 107(d)(2)(d). We have no quarrel with plaintiff’s contention that, where the transferee is in a position to control the bankrupt’s disposition of his property, as here, the intent of the transferee rather than that of the bankrupt is determinative for the purposes of section 107(d)(2)(d).
 
 See, e. g., In re Cushman Bakery,
 
 526 F.2d 23, 31-32 (1st Cir. 1975),
 
 cert. denied,
 
 425 U.S. 937, 96 S.Ct. 1670, 48 L.Ed.2d 178 (1976); 4
 
 Collier on Bankruptcy
 
 § 67.37(2), at 534 (14th ed. 1978). Neither do we dispute that transactions between a parent and subsidiary, when challenged in a bankruptcy proceeding, must be subjected to close scrutiny.
 
 See, e. g., Pepper v. Litton,
 
 308 U.S. 295,
 
 *8
 
 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939).
 
 [8]
 
 However, on the basis of the evidence adduced at trial, and recognizing that a trial court’s findings on this issue deserve special deference because of the “peculiar importance in § 67(d)(2)(d) cases of the credibility of the witnesses,” 4
 
 Collier on Bankruptcy,
 
 at 545 n.47, we are unable to conclude that the court was clearly erroneous in finding that Avtek Inc. received the proceeds without any intention of hindering, delaying, or defrauding AMC’s creditors. No attempt was made to conceal the transfer in any way; indeed, the sale of inventory could hardly have been shrouded in secrecy. Perhaps more significant is the fact that AMC’s receipts always had been transferred directly to Avtek Inc.’s Vermont account. That the proceeds here were not handled in any special manner, but instead travelled the customary path pursuant to normal business practice, militates against any suggestion of fraudulent conduct. And the fact that, again in accordance with past practice, Avtek Inc. then transferred the proceeds to the bank cuts the same way; had Avtek Inc. been actuated by a fraudulent design, one might reasonably expect it to have secured a more tangible benefit
 
 from
 
 the transaction. Plaintiff is certainly correct in contending that fraud can be proved circumstantially.
 
 E. g.,
 
 4
 
 Collier on Bankruptcy,
 
 at 537-38. However, he has pointed to no circumstances in the present case tending to reinforce whatever inference of fraud might derive from the presence of a parent-subsidiary relationship alone. Indeed, his principal argument in this regard is that he “was not given the opportunity” to prove fraud on the part of Avtek Inc.—an argument that can only be termed fanciful.
 
 [9]
 

 For these reasons, we think the district court correctly ruled that the initial transfer from AMC to Avtek Inc. was immune from attack. Plaintiff’s final contentions are that the bank acted with actual fraud itself and that it dominated and controlled Avtek Inc. The allegation of fraud on the part of the bank is not only unsupported on the record but now irrelevant; the propriety of the initial transfer to Av-tek Inc. obviates the need to examine the frame of mind of any subsequent recipient of the proceeds. On the other hand, the bank’s alleged control of Avtek, Inc., if accurate, would necessitate such an inquiry. But this contention is unsupported by the record. Again, plaintiff argues that the court, by denying his motion for further discovery, prevented him from offering proof on this issue.
 
 See
 
 note 9
 
 supra.
 
 However, since his own complaint included this allegation of control, he is in no position even to feign surprise. We find no error.
 

 Affirmed.
 

 [1]
 

 . Plaintiff also claimed initially that the transfer was a preference in favor of a particular creditor violative of 11 U.S.C. § 96(a) (1970). The parties later stipulated, however, that the transfer occurred more than four months prior to the filing of the bankruptcy petition, thereby rendering this provision inapplicable. Plaintiffs complaint alleged in addition that the bank had breached an agreement to pay to the unsecured creditors of AMC fifty percent of their claims out of proceeds received. This count was dropped at trial.
 

 [2]
 

 . Avtek Inc.’s security agreement with the defendant required that any outstanding loan be reduced as money was received. Consequently, Avtek Inc. maintained a “depository transfer” account in Vermont, by which all deposits were wired down to the defendant the following day to be applied against the loan. Although Avtek Inc. kept records of receipts from and disbursements to or for AMC, the accounts were not segregated; all deposits stemming from AMC’s operations similarly were sent to the defendant to reduce Avtek Inc.’s loan.
 

 [3]
 

 . This provision reads:
 

 Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent — (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debt- or who is or will be thereby rendered insolvent, without regard to his actual intent ....
 

 11 U.S.C. § 107(d)(2)(a) (1970). “Fair consideration” for the purposes of this section is defined as follows:
 

 [C]onsideration given for the property or obligation of a debtor is “fair” (1) when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied, or (2) when such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained.
 

 Id.
 
 § 107(d)(1)(e).
 

 [4]
 

 . The somewhat unusual procedural path trav-elled by the present case deserves mention in this regard. Following several unsuccessful attempts to reach trial in 1977, the district judge transferred the case to a second judge, before whom trial commenced on April 11, 1979. At the close of the plaintiffs case, defendant moved for dismissal under Fed.R.Civ.P. 41(b). In a memorandum dated April 12, 1979, the court ruled: “Plaintiffs evidence does not
 
 *6
 
 show that AMC made any transfer whatsoever to [the bank] .... Therefore the plaintiff has failed to prove a
 
 prima facie
 
 case . .. . ” It suggested that defendant renew its motion for summary judgment “based exclusively upon the [successive transfer] theory advanced on pages 19 and 20 of the trial brief” filed by defendant in open court the previous day. The bank submitted such a motion and a supporting affidavit on April 24, and the trustee filed an objection on May 5 in which he recited his understanding of the pretrial stipulation discussed above. Accompanying plaintiff’s objection was his motion to reopen discovery. In a memorandum dated June 26, 1979, the judge concluded that he had “misunderstood the posture” of the case and therefore withdrew his earlier memorandum, vacated all proceedings before him, and returned the case to the first judge. The court denied plaintiff’s motion to reopen discovery on October 11, 1979, and the case went to trial five days later. Plaintiff presented no further evidence, relying on that adduced at the earlier hearing for his case in chief and declining the opportunity to present rebuttal evidence on the successive transfer issue.
 

 [5]
 

 . In particular, he states: “Incident to trial preparation, the parties stipulated in a pretrial memorandum to certain contested issues of law and fact. Discovery was limited to the issues raised thereby.” Appellant’s Brief 1.
 

 [6]
 

 . This section provides in pertinent part:
 

 A transfer made or an obligation incurred by a debtor adjudged a bankrupt under this title, which is fraudulent under this subdivision against creditors of such debtor having claims provable under this title, shall be null and void against the trustee, except as to a bona fide purchaser, lienor, or obligee for a present fair equivalent value:
 
 Provided, however,
 
 ... That such purchaser, lienor, or obligee, who without actual fraudulent intent has given consideration less than fair, as defined in this subdivision, for such transfer, lien, or obligation, may retain the property, lien, or obligation as security for repayment.
 
 *7
 
 11 U.S.C. § 107(d)(6) (1970). The bank would not profit from the exception for bona fide purchasers since it provided no
 
 present
 
 value to Avtek Inc. for the proceeds, having received them instead as partial payment for an antecedent debt. Accordingly, its only possible recourse would be the retention of the proceeds “as security for repayment” under the proviso.
 
 See generally 4 Collier on Bankruptcy
 
 § 67.-41(5)-(6) (14th ed. 1978). It being unnecessary to our decision, we express no opinion as to whether the bank falls within this proviso, or as to whether any finding on this issue is possible on the present record.
 

 [7]
 

 . In arguing to the contrary, plaintiff relies principally on
 
 In re Security Products Co.,
 
 310 F.Supp. 110 (E.D.Mo.1969). At issue there was a subsidiary’s assignment of an account receivable to its parent, which had immediately reassigned the account to the petitioner bank to secure a note executed by the parent for money loaned to it by the bank. Notwithstanding that the parent had “downstreamed” operating funds to the subsidiary,
 
 see id.
 
 at 123, the court ruled that the latter received no consideration for the assignment and it therefore voided the transfer as a fraudulent conveyance.
 
 Security Products
 
 admittedly can be read as running contrary to the result reached in the instant case. However, a different reading appears the more supportable. For reasons not discussed in the opinion, the petitioner there never sought to uphold the assignment by reference to the parent’s downstreaming; the “sole controverted issue” was whether the subsidiary’s corporate identity should be disregarded, such that consideration paid to the parent would constitute consideration to the subsidiary.
 
 Id.
 
 at 111. Accordingly, we see no conflict between the court’s reasoning there and the result reached here.
 

 [8]
 

 .
 
 See generally
 
 Riemer,
 
 Claims Against Bankrupt Corporations Based on Advances by Controlling Stockholders or Parent Corporations,
 
 73 Com.L.J. 273 (1968).
 

 [9]
 

 . In his motion to reopen discovery, which was properly denied for the reasons discussed above, plaintiff made no mention of any desire to investigate the conduct or motivations of Avtek Inc. Instead, he requested further discovery only to determine specifically (1) whether the purchasers of AMC’s inventory issued checks to AMC, Avtek Inc., or the bank, and (2) whether the bank “was controlling the affairs of Avtek Inc.” at the time of the sale. We also reiterate that plaintiff declined the opportunity to present additional evidence at the second trial.
 
 See
 
 note 4
 
 supra.