In re MARQUIS PRODUCTS,
INC., Debtor.

MARQUIS PRODUCTS, INC., Plaintiff,

v.

CONQUEST CARPET MILLS,
INC., Defendant.

Bankruptcy No. 91–10499.
Adv. 92–1005.

United States Bankruptcy Court,
D. Maine.

Feb. 10, 1993.

Jacob A. Manheimer, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, ME, for debtor/plaintiff.

James R. Wholly, Gross, Minsky, Mogul & Singal, Bangor, ME, for defendant.

## MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Bankruptcy Judge.

Marquis Products, Inc. ("Marquis"), the debtor-in-possession, seeks to avoid a pre-petition mortgage given to Conquest Carpet Mills, Inc. ("Conquest"), as a fraudulent transfer under 11 U.S.C. § 548.[1] In view of the evidence adduced at trial, I conclude that the mortgage must be set aside.[2]

### Facts

#### 1. Corporate History.

Marquis, a Georgia corporation which formerly manufactured and wholesaled carpet, is a wholly-owned subsidiary of NRF, Inc. ("NRF"). NRF, a closely-held Maine corporation, is also a Chapter 11 debtor.[3] NRF distributes floor coverings, including carpets. All of its stock is owned by Norman, Roger and Frank Pomerleau. The three Pomerleaus sit as NRF"s Board of Directors.

After NRF had established itself as a successful distributor, Norman and Roger Pomerleau decided to enter the carpet manufacturing business. Together they organized Marquis in November 1982. Norman and Roger became Marquis' only stockholders and directors. Marquis commenced business with $500.00 cash. NRF loaned Marquis the funds it needed to obtain manufacturing facilities in Calhoun, Georgia, to acquire equipment and to pay personnel. On May 24, 1984, Norman and Roger Pomerleau transferred one hundred percent of the Marquis stock to NRF. In January 1990, NRF contributed $9,500.00 in additional capital to Marquis.

In response to changing industry conditions, Marquis decided to wind up its manufacturing operations in June 1990. It retained only three or four employees, all of whom worked to dispose of Marquis' remaining manufactured inventory while also purchasing and wholesaling carpeting manufactured elsewhere. In February 1991, Marquis decided to halt all operations. As of March 1991, Marquis was out of business.

NRF remained an active floor covering distributor, but, due to a number of adverse business developments, including the demise of its principal lender, NRF's board authorized a Chapter 11 bankruptcy filing on February 15, 1991. The directors enacted the resolution to enable NRF to file for relief when, and if, circumstances required it. In the meantime, the company attempted to stay afloat without filing. NRF ultimately filed for relief under Chapter 11 on April 19, 1991. Marquis' board authorized a Chapter 11 filing on June 14, and Marquis filed its petition on June 18, 1991.[4]

---

1. Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

2. This memorandum sets forth findings of facts and conclusions of law in accordance with F.R.Bankr.P. 7052. It expands upon findings and conclusions previously rendered orally.

   Marquis has argued in the alternative that providing the mortgage constituted a voidable preference. 11 U.S.C. § 547(b). In light of the finding that the mortgage was a fraudulent

transfer, the preference issues need not be addressed.

3. NRF's Chapter 11 case, No. 91–10324, has been consolidated with Marquis' case for administrative purposes.

4. The *bona fides* of Marquis' petition for Chapter 11 relief are unchallenged. Together with NRF, Marquis has filed a joint plan of reorganization which indicates that Marquis' business and assets will be utilized in a fashion that

## 2. The Inter–Company Relationship.

NRF loaned operating funds to Marquis throughout the latter's active existence. The companies' books document a running account of Marquis' obligations to NRF, periodically adjusted for inter-company sales, loan advances and funds transfers. In 1989, when NRF obtained financing from Bank of New England, the loan was collateralized, in part, by a lien on Marquis' assets. One consequence of the loan was that NRF continued to have available money to "downstream" to Marquis to fund its operations.

At all times, NRF was Marquis' principal customer. During Marquis' first years, NRF purchased approximately ninety-five percent of the product Marquis manufactured. Later, as Marquis expanded its customer base, NRF's share gradually dropped to approximately fifty-five percent of Marquis' product.

Although NRF and Marquis observed required corporate formalities, the Pomerleaus employed what they describe as an "entrepreneurial" style of management. Details of the corporations' businesses, including parent/subsidiary transactions, were not always documented with rigorous formality. NRF regularly recorded the status of the NRF/Marquis loan, but Marquis' obligation was not memorialized in a note or lending agreement. Until 1988, NRF did not charge interest on the loan. Thereafter, it did.

When Marquis shipped carpet to NRF, NRF reduced the loan balance to reflect the price Marquis charged for the goods.[5] When Marquis received payment from unaffiliated customers, it deposited the funds in its principal account, an account to which NRF had access, at a Maine bank. When the account balance exceeded Marquis' immediate requirements, money was trans-ferred to NRF, reducing the loan balance. When Marquis needed operating funds, NRF supplied them, thereby increasing Marquis' obligation.

Marquis employed Tim Cote as its chief operating officer to manage day-to-day activities in Georgia. Cote, who had no role in NRF, hired and fired workers and made routine management decisions. Marquis had it own tax identification number and retained separate legal counsel in Georgia. Norman Pomerleau, who was Marquis' president as well as NRF's, was but modestly involved in the details of Marquis' operations. He travelled to Georgia four to five times per year.

For most of its history, Marquis maintained a separate payroll account at a bank in Calhoun, Georgia. Later, its payroll was handled by a payroll service company that also handled NRF's payroll. Not surprisingly, there was some other administrative overlap. For example, NRF's accounting department provided accounting and bookkeeping services for Marquis, and prepared consolidated financial statements for the companies.

Although Marquis' principal creditor was NRF throughout its entire active existence, Marquis dealt regularly with unaffiliated suppliers and customers. Marquis operated profitably in 1988 and 1989, at least in the sense that it was able to reduce substantially its obligations to NRF during each of those years.[6] Marquis' schedules disclose that, in addition to NRF, Marquis owed money to nine unsecured and priority tax creditors with claims of approximately $8,500.00.[7]

## 3. The Conquest Mortgage.

In March 1991, NRF requested a $300,-000.00 line of credit from Conquest, a sup-

---

leaves NRF as the sole, viable, surviving entity. Defendant's Exhibit No. 7.

**5.** NRF received no special price breaks or discounts from Marquis on account of the companies' affiliation. The price charged included a mark-up standard for the industry.

**6.** Putting aside amounts paid on the NRF loan, Marquis had net operating revenues before tax-es of $58,8767.35 in 1988 and of $84,703.78 in 1989.

**7.** The figures exclude, as well, Conquest's claim based on the mortgage and NRF's line of credit debt and amounts owed to Bank of New England's successor based on Marquis' upstream guaranty of NRF's bank debt.

plier and substantial creditor. Conquest insisted that the line be secured. To secure it, Norman Pomerleau executed a deed, dated March 22 and recorded March 26, 1991, conveying a mortgage in Marquis' Georgia real property to Conquest.[8]

Other than granting the mortgage, Marquis had no business relationship whatsoever with Conquest. The mortgage deed ran directly from Marquis, identified on the deed as a Georgia corporation, to Conquest. No adjustment was made to the Marquis/NRF loan account to reflect the value of the interest conveyed by Marquis to Conquest at NRF's behest.

### Discussion

Section 548(a) of the Bankruptcy Code provides that the trustee may avoid a transfer of the debtor's interest in property that was made within one year before the bankruptcy filing if the debtor received less than reasonably equivalent value in exchange and was, or became, insolvent on the date of the transfer, if the transfer left the debtor with unreasonably small capital for its business activities, or if the debtor intended or believed that it would incur future debts that would be beyond its abili-

ty to repay.[9] There is no evidence, and the debtor does not contend, that the mortgage conveyance to Conquest was made with the intention to delay, hinder or defraud Marquis' creditors.[10] However, on March 26, 1991 when the conveyance was made, Marquis was insolvent.[11]

As one court of appeals has explained:

The purpose of voiding transfers unsupported by "reasonably equivalent value" is to protect creditors against the depletion of a bankrupt's [sic] estate. 11 U.S.C. § 548(a)(2); *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 829–30 (5th Cir.1959), *cert. denied*, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960). Therefore, this provision does not authorize voiding a transfer which "confers an economic benefit upon the debtor," either directly or indirectly. *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2nd Cir.1981). In such a situation, "The debtor's net worth has been preserved," and the interests of the creditors will not have been injured by the transfer. *Id.*

*In re Rodriguez*, 895 F.2d 725, 727 (11th Cir.1990) (footnote omitted). *See also Max Sugarman Funeral Home, Inc. v. A.D.B.*

---

**8.** At the time of the transfer, the property had a market value of $209,000.00.

**9.** The complete text of § 548(a) provides as follows:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with the actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

**10.** *See* § 548(a)(1), *supra* n. 9.

**11.** Section 101(32)(A) defines corporate insolvency as a financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title[.]

Although Conquest has contended that Marquis' debt to NRF should "not count" or be subordinated in connection with the insolvency analysis, the evidence establishes beyond doubt that Marquis was, indeed, actually indebted to NRF in substantial amounts. Whether NRF's claims might be subordinated to other claims against Marquis, they count in the insolvency analysis.

*Investors,* 926 F.2d 1248, 1254 (1st Cir. 1991). Thus, this court must consider whether some benefit amounting to "reasonably equivalent value" accrued to Marquis in connection with its transfer of a mortgage on its Georgia property to Conquest.

"It may be said that, as a general rule, an insolvent debtor receives 'less than a reasonable equivalent value' where it transfers its property in exchange for a consideration which passes to a third party. In such a case, it ordinarily receives little or no value." *Ear, Nose & Throat Surgeons of Worcester, Inc. v. Guaranty Bank & Trust Co. (In re Ear, Nose & Throat Surgeons of Worcester, Inc.),* 49 B.R. 316, 320 (Bankr.D.Mass.1985), quoting *In re Royal Crown Bottlers of North Alabama, Inc.,* 23 B.R. 28, 30 (Bankr.N.D.Ala.1982).

That consideration for the transfer may have passed, in a formal sense, to a third party, does not establish conclusively that the transferor did not receive reasonably equivalent value. Such value may arrive in the transferor's hands indirectly, via the original recipient. Alternatively, circumstances may exist that require the court to ignore formal distinctions between the transferor and the third party, so that, despite the labels employed, the consideration for the transfer has been bestowed "directly" on the transferor. It is to these possible theories of consideration that we now turn.

### 1. *Indirect Benefit.*

■ Particularly in transactions that involve affiliated corporations, it may .be the case that consideration given to one of the affiliates in return for the transfer of an interest of another, redounds sufficiently to the benefit of the transferor as to constitute reasonably equivalent value. *See Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 646–47 (3rd Cir.1991), *cert. denied sub nom. Committee of Unsecured Creditors v. Mellon Bank, N.A.,* — U.S. ——, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992); *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d at 991; *In re Rodriguez,* 895 F.2d at 727–28. *See also Geremia v. First National Bank of Boston,* 653 F.2d 1, 7 (1st Cir.1981) (Bankruptcy Act case finding direct consideration, but discussing "fair consideration" under the Bankruptcy Act's fraudulent transfer provision in the context of parent/subsidiary relations);[12] *Telefast, Inc. v. VU–TV,* 591 F.Supp. 1368, 1379 (D.N.J. 1984) (applying state fraudulent conveyance law and noting that the "lack of perceptible 'direct' benefit to a subsidiary guaranteeing the loan of its parent should not be viewed as tantamount to a lack of 'fair consideration' under the UFCA").[13]

Indirect benefits can arise in a variety of circumstances in the parent/subsidiary context. For instance, a subsidiary which guaranties a parent's debt may benefit indirectly by securing a future sale, or by improving its public image through consummating a large transaction. *Telefast,* 591 F.Supp. at 1379. Or, in the classic case, a subsidiary receives an indirect benefit where its upstream guarantee enables its parent to procure a loan and, thus, to provide funds to the subsidiary. *See Carl,* 60 Am.Bankr.L.J. at 109–111, 115 (defining "upstream guarantee" as a subsidiary's

---

**12.** This case presents circumstances different from those discussed by the First Circuit in *Geremia.* In that case, the trial found a two-step transaction by which the debtor's accounts were transferred to its parent and, subsequently, to the parent's lender. Not only was the initial transfer to the parent, rather than to the third party, but, in return for the transfer, the parent reduced the amount of the debt owed it by the subsidiary. 653 F.2d at 7. Here, Marquis conveyed a mortgage to Conquest, a party with whom it had no contractual relationship. Moreover, although NRF was a substantial creditor of Marquis, it gave Marquis no credit against the obligation by virtue of the transfer.

**13.** The Uniform Fraudulent Conveyance Act (UFCA), like § 67d of the Bankruptcy Act of 1898 (11 U.S.C. § 107d, repealed 1978), employs a standard of "fair consideration" in evaluating fraudulent transfers. This standard is substantially similar to Code § 548's "reasonably equivalent value" standard. *See In re Rodriguez,* 895 F.2d at 727 n. 2. *See also Kenneth J. Carl, Fraudulent Transfer Attacks on Guaranties in Bankruptcy,* 60 Am.Bankr.L.J. 109, 117–18 (1986) (hereinafter "Carl"); 4 Lawrence P. King, *Collier on Bankruptcy* ¶ 548.01[2] (15th ed. 1992).

guaranty of its parent's obligation and explaining the benefits that can result).[14]

In ascertaining whether Marquis received an indirect benefit constituting reasonably equivalent value in exchange for the Conquest mortgage, I will consider all factors bearing on the transaction and the relationships among the parties. *See Jacoway v. Anderson (In re Ozark Restaurant Equipment Co., Inc.)*, 850 F.2d 342, 345 (8th Cir.1988).

> The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred. Thus, when the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received.

*Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d at 647.

In this case, there is no evidence that Marquis received indirect benefits as a result of the mortgage conveyance. At the time the mortgage was granted, Marquis was moribund. Conquest's providing a line of credit to NRF did not aid Marquis in any way. NRF provided no further support to Marquis as a consequence of the transaction. Thus, I conclude that Marquis received no indirect benefit in return for the mortgage.

#### 2. *Direct Benefit: One Entity or Two?*

■ Another way in which Marquis might have received reasonably equivalent value in exchange of the mortgage would be if NRF, the entity that received consideration from Conquest, is, after all, the same entity as (rather than a distinct entity from) Marquis. Conquest argues that NRF so dominated Marquis' affairs that their corporate separateness should be disregarded for purposes of this fraudulent transfer action and, therefore, that the consideration Conquest gave to NRF was, in reality, consideration also given to Marquis—a direct benefit.

The essence of Conquest's argument is that the corporate veil separating Marquis and NRF should be disregarded, rendering them one entity. *See, e.g., In re Rodriguez*, 895 F.2d at 728–29. The parties agree that, should state law govern the issue of corporate veil piercing, Georgia law controls.[15] Although Conquest contends that Marquis' separate corporate existence should be disregarded under Georgia law, it argues in the alternative that a less demanding, federal standard should operate here.

#### a. *State Law Approach.*

■ Generally speaking, federal courts of appeal apply state law principles of corporate veil piercing when analyzing questions concerning recognition or disregard of the corporate form in the context of bankruptcy transfer avoidance actions. *See In re Rodriguez*, 895 F.2d at 728; *In re Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir.1988) (discussing enforceability of corporation's guarantee of an affiliated corporation's obligations in the context of determining insolvency under § 547). Although, as discussed above, a debtor may receive a benefit indirectly when consideration for a challenged transfer flows to an affiliate, the discrete question whether the debtor was, at the time of the exchange, a legal entity distinct from the affiliate, will generally be decided under the pertinent state law rules governing creation, perpetuation and vitality of the corporate form.

---

**14.** Considering such factors, were avoidability of Marquis' 1988 pledge of assets to secure NRF's bank financing at issue, a strong case could be made that, because bank financing provided NRF with funds that could be "downstreamed" to fund Marquis' operations, Marquis received an indirect benefit and, therefore, reasonably equivalent value for the pledge.

**15.** "Ordinarily, [a] federal court should honor [the] parties' shared view as to applicable substantive law." *McCallion v. Lane (In re Lane)*, 937 F.2d 694, 696 n. 3 (1st Cir.1991). In any event, Maine authorities addressing the circumstances under which corporate separateness may be disregarded are substantially similar to Georgia authorities. If Maine law were to apply, the result would not be changed. *See generally*, James B. Zimpritch, *Maine Corporation Law Practice* § 4.5 (1991).

Under Georgia law, the question whether Marquis' separate corporate existence should be disregarded here is not close. Georgia courts apply a strict standard for setting aside the corporate form. *Fuda v. Kroen,* 204 Ga.App. 836, 420 S.E.2d 767 (1992).

We have long recognized that "great caution should be exercised by the court in disregarding the corporate entity ..." However, the court will disregard the separateness of the corporate entity where the corporation has "overextended its privileges in the use of a corporate entity in order to defeat justice, to perpetrate fraud or to evade statutory, contractual or tort responsibility."

*Hickman v. Hyzer,* 261 Ga. 38, 401 S.E.2d 738, 739–40 (1991) (citations omitted).[16] A party attempting to establish grounds for disregarding the corporate form due to a parent's domination of its subsidiary, or the parent's use of the subsidiary as an *alter ego,* has a hard row to hoe.

To establish a basis for disregarding the corporate entity on the ground that the corporation is a mere alter ego of an individual, "it must be shown that the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist; and [that] to adhere to the doctrine of corporate entity would promote injustice or protect fraud. [Cits.]" (Punctuation omitted). *Trans–Amer. Communications v. Nolle,* 134 Ga.App. 457, 460(1)(a), 214 S.E.2d 717 (1975).

*Marett v. Prof. Ins. Careers, Inc.,* 201 Ga. App. 178, 410 S.E.2d 373, 375 (1991). In short, the owners must have used the subsidiary as a mere agent and conduit for its own aggrandizement, as when it systematically drains the subsidiary of worth for its own enrichment, at the expense of those who deal with the subsidiary. *See Trans–American Communications, Inc. v. Nolle,* 134 Ga.App. 457, 214 S.E.2d 717.

Putting aside the mortgage at issue, the evidence does not warrant setting aside Marquis' separate existence here.[17] Marquis was organized under Georgia law. It had its own operating officer, employees, manufacturing facilities and counsel. Its activities were distinct from, albeit related to, its parent's business. Although there was some administrative overlap in the corporations' affairs, there is insufficient evidence to conclude that NRF so dominated Marquis as to leave it, in reality, without separate legal existence.

### b. *Federal Law Approach.*

Conquest urges the court to endorse a federal rule that would set aside the corporate form when governing state law principles would not do so. It points to *United Paperworkers Int'l Union v. Penntech Papers, Inc.,* 439 F.Supp. 610 (D.Me.1977), *aff'd sub nom. United Paperworkers Int'l Union v. T.P. Property Corp.,* 583 F.2d 33 (1st Cir.1978). In *Penntech* the district court observed "that a federal court may pierce the corporate veil for any reason acceptable under the common law of the state in question or if disregarding the corporate entities is the only way to protect a substantial federal policy or interest." 439 F.Supp. at 621 (footnote omitted). The *Penntech* courts analyzed whether recognizing the separate corporate existence of a parent and a subsidiary would do violence to federal labor

---

16. Factors considered in deciding whether to pierce the corporate veil include commingling of assets, *Anderson v. Chatham,* 190 Ga.App. 559, 379 S.E.2d 793 (1989); disregard of corporate formalities, *Abbott Foods of Georgia, Inc. v. Alberton Poultry Co., Inc.,* 173 Ga.App. 672, 327 S.E.2d 751 (1985); and under-capitalization if it was "coupled with evidence of an intent at the time of the capitalization to improperly avoid future debts of the corporation." *Hickman v. Hyzer,* 401 S.E.2d at 740.

17. One might argue that conveying a mortgage or other interest in a subsidiary's valuable assets to secure lending for a parent is, in and of itself, probative of domination. Be that as it may, taken as a whole, the evidence does not support piercing Marquis' corporate veil under Georgia law. Indeed, in the bankruptcy context, the appropriate remedy for such a discrete transgression is to avoid the transfer under § 548(a), thereby bringing the interests transferred back into the subsidiary's estate for the benefit of its creditors.

law policies and concluded that it would not. *United Paperworkers v. T.P. Property Corp.*, 583 F.2d at 35–36.

More recently, in another context, the First Circuit restated its view that, when important federal law policies are at stake, a federal veil piercing standard that takes note of factors pertinent to that policy should be employed. In *United Electrical, Radio and Machine Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d 1080 (1st Cir.1992), the court considered whether the district court for Massachusetts could exercise jurisdiction over the Scottish parent of a Delaware subsidiary doing business in Massachusetts under the Labor Management Relations Act (LMRA) and the Employee Retirement Income Security Act (ERISA). The parent had insufficient contacts with the forum to sustain jurisdiction, 960 F.2d at 1090–91, but the court considered whether the subsidiary's contacts with Massachusetts could be attributed to the parent. *Id.* Observing that Massachusetts Common Law permits disregard of the corporate form only in rare situations, the appeals court stated:

> It would, however, serve no useful purpose to explore the interstices of the state-law standard. This is, after all, a federal question case—and in federal question cases, courts are wary of allowing the corporate form to stymie legislative policies. *See, e.g., First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 630, 103 S.Ct. 2591, 2601, 77 L.Ed.2d 46 (1983); *Bangor Punta Operations, Inc. v. Bangor & A. R.R.*, 417 U.S. 703, 713, 94 S.Ct. 2578, 2584, 41 L.Ed.2d 418 (1974). For

this reason, a federal court, in deciding what veil-piercing test to apply, should "look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form, an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine." *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir.1981) (citations omitted).

*Id.* at 1091–1092.

It may be appropriate to employ a federal veil piercing standard in cases where federal bankruptcy policy could be frustrated by resort to state law. However, I conclude that Conquest has failed to identify any such policies that are at stake here.

■ The policy underlying § 548 is to protect creditors against the depletion of a bankruptcy estate through transfers of the debtor's interests in property taking place within one year before the bankruptcy petition was filed. *Max Sugarman Funeral Home, Inc.*, 926 F.2d at 1254. *Accord, In re Rodriguez*, 895 F.2d at 727; *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d at 647. Such a depletion of Marquis' estate would be precisely the result if the Conquest mortgage were not avoided.[18] Moreover, Conquest participated in the transaction with its eyes wide open: Dealing with NRF, and insisting on security in doing so, it sought and received a transfer of rights in the property of a separate and distinct legal entity.[19] Under these facts, recognizing the separate existence of NRF and Marquis threatens no federal bankruptcy policy.[20]

---

**18.** That NRF and Marquis have filed a proposed plan of reorganization that effects at least a partial consolidation of their estates is not determinative. To begin, the proposed plan remains a work in progress. The debtors, promising changes to come, have not yet scheduled a hearing on the disclosure statement for the joint plan. Be that as it may, affiliated corporations may voluntarily pool their assets in the context of reorganization proceedings, but doing so does not establish that, historically, they conducted their affairs as a consolidated entity. *Cf. In re Xonics Photochemical, Inc.*, 841 F.2d at 201 (discussing involuntary veil piercing in light of subsequent, voluntary consolidation within reorganization proceedings).

**19.** Conquest also argues that avoiding the transfer enables NRF and its principals to "pull a fast one" on it, inducing it to extend credit based on what turned out to be illusory security. I reject that contention and credit the testimony of Marquis' witnesses who testified that, at the time that NRF negotiated the line of credit with Conquest, neither NRF nor Marquis had the intention to deceive Conquest by subsequently filing for relief and invoking § 548.

**20.** In a variation on the theme, Conquest has argued that there was a sufficient "identity of interest" between Marquis and NRF to conclude that Marquis received reasonably equivalent value in exchange for its transfer.

Conquest has demonstrated no grounds, under either federal or state law, to disregard the separate corporate identities of Marquis and NRF. Marquis received no direct benefit in exchange for the mortgage and, therefore, no consideration that could amount to reasonably equivalent value.

### Conclusion

For the reasons set forth above, I conclude that Marquis conveyed a mortgage interest in the Calhoun, Georgia property to Conquest within one year of its bankruptcy petition, that it was insolvent at the time and, finally, that it received less than reasonably equivalent value in exchange for the transfer. Thus, pursuant to § 548(a)(2), the mortgage will be avoided. An appropriate order will issue forthwith.

---

Some cases do hold that an action that benefits one party may result in benefit to another because their interests are identical. *See Telefast v. VU–TV, Inc.,* 591 F.Supp. at 1377–78 (Uniform Fraudulent Conveyance Act); *Lawrence Paperboard Corp. v. Arlington Trust Co. (In re Lawrence Paperboard Corp.),* 76 B.R. 866, 874 (Bankr.D.Mass.1987); *Ear, Nose & Throat,* 49 B.R. at 320 (citing Act- and Code-era authorities); *Royal Crown Bottlers,* 23 B.R. at 28. However, the identity of interest analysis is but another way of looking at the question of indirect benefit. Cases employing that analysis do not set up a lower standard for corporate veil piercing; rather, they merely recognize that benefit can flow between or among related entities, each of which exists separately. One commentator has characterized a leading case employing indirect benefit analysis as "a step away from the traditional corporate formalism approach and a refinement of the concept of third-party consideration." Alan J. Litman, *Multiple Intent, Veil–Piercing, and Burdens and Benefits: Fraudulent Conveyance Law and Multiparty Transactions,* 39 U.Miami L.Rev. 307, 314–315 (discussing *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979.) *See also Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.,)* 124 B.R. 984, 998 (Bankr.S.D.Ohio 1990) (collecting authorities on integrating the separate components of a leveraged buyout transaction to "assess the net effect" of the transactions under review); *Ear, Nose & Throat,* 49 B.R. at 320 ("what benefits one will, in such case, benefit the other …").